AIMCOR, ALABAMA SILICON, INC., and American Alloys, Inc., Plaintiffs,

v.

UNITED STATES, Defendant.

Court No. 93–07–00428.

United States Court of International Trade.

Dec. 13, 1994.

Baker & Botts, L.L.P., William D. Kramer, Charles M. Darling, IV, and Clifford E. Stevens, Jr., Washington, DC, for plaintiffs.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Cynthia. B. Schultz, Boguslawa B. Thoemmes, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, for defendant.

## MEMORANDUM OPINION
## AND ORDER

DiCARLO, Chief Judge:

Plaintiffs, United States manufacturers of ferrosilicon, move for judgment on the agen-

cy record pursuant to USCIT R. 56.2, contesting certain parts of the final determination of the Department of Commerce in *Final Determination of Sales at Less Than Fair Value: Ferrosilicon From Venezuela,* 58 Fed.Reg. 27,522 (Dep't Comm.1993). The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

## BACKGROUND

In response to plaintiffs' petition, Commerce initiated an antidumping investigation of ferrosilicon imports from Venezuela. *Initiation of Antidumping Duty Investigations: Ferrosilicon From Argentina, Kazakhstan, the People's Republic of China, "Russia, Ukraine, and Venezuela,* 57 Fed.Reg. 27,021 (Dep't Comm.1992). CVG–Venezolana de Ferrosilicio, C.A. (FESILVEN) was the sole Venezuelan producer of ferrosilicon. The period of investigation was from December 1, 1991 to May 31, 1992.

During the investigation, plaintiffs claimed that FESILVEN's home market sales should not be used as the basis for establishing the foreign market value (FMV) because FESILVEN made home market sales at less than cost of production (COP). At plaintiffs' request, Commerce initiated a COP investigation of FESILVEN pursuant to 19 U.S.C. § 1677b(b) (1988), which requires Commerce to disregard home market sales made at less than COP if such sales have been made over an extended period of time and in substantial quantity. *Id.* In such a circumstance, the statute directs Commerce to use constructed value (CV) of the merchandise to determine the FMV. *Id.*

In order to determine whether home market prices were below COP, Commerce calculated COP based on the sum of FESILVEN's cost of materials, fabrication, and general expenses. *See* 19 C.F.R. § 353.51(c) (1994). In the production of ferrosilicon, FESILVEN purchased inputs from five related suppliers: (1) electricity from CVG Electrificacion del Caroni, C.A. (EDELCA); (2) woodchips from CVG Productos Forestales del Oriente, C.A. (PROFORCA); (3) electrode paste from CVG Siderurgica del Orinoco, C.A. (SIDOR); (4) iron ore from CVG Ferrominera Orinoco, C.A. (FERROMINERA); and (5) limestone from CVG Compania Nacional de Caliza, S.A. (CONACAL). FESILVEN and its related suppliers are members in a group of businesses having intertwined ownership, headed by a parent company Corporacion Venezolana de Guayana (CVG). CVG holds more than 50 percent ownership in FESILVEN and its related suppliers.

Having determined that FESILVEN and its related suppliers were related parties, Commerce treated them as a single entity for the purpose of calculating FESILVEN's COP. Following its general practice in related party transactions, Commerce used COPs of the related suppliers, rather than transfer prices, in determining the cost of components used in FESILVEN's production. However, where the related suppliers purchased inputs in their own production from other CVG members, Commerce utilized transfer prices in calculating the group members' COPs. *Final Determination,* 58 Fed.Reg. at 27,528.

Commerce conducted on-site verification of COP and CV data submitted by FESILVEN and accepted the verified data; where the costs were not appropriately quantified or valued, it used best information available (BIA) or made an adjustment to the data. *Final Determination,* 58 Fed.Reg. at 27,524–25. Where more than 90 percent of FESILVEN's sales of a given product type were at prices above COP, Commerce did not disregard any below-cost sales because the below-cost sales were not made in substantial quantities. If between 10 and 90 percent of the sales of a given product type were made at below COP over an extended period of time, Commerce discarded only the below-cost sales. Where more than 90 percent of the sales were made at prices below COP over an extended period of time, Commerce disregarded all sales for that product type and calculated FMV based on CV. *Id.* In the final determination, Commerce found that FESILVEN was selling ferrosilicon in the United States at less than fair value, and calculated the weighted-average dumping margin at 9.55 percent. *Id.* at 27,534.

Plaintiffs allege that Commerce improperly calculated FESILVEN's COP, and the

improper calculation deflated FESILVEN's dumping margin. Specifically, plaintiffs assert: (1) Commerce may not treat FESILVEN and its related companies as a single entity while treating FESILVEN and CVG as separate entities in the companion countervailing duty investigation of ferrosilicon from Venezuela; (2) Commerce should have used transfer prices rather than actual costs of related suppliers in determining FESILVEN's COP; (3) Commerce inadequately calculated the amount of general expenses in FESILVEN's COP and the COPs of FESILVEN's related suppliers; and (4) Commerce inadequately calculated the COPs of FESILVEN's related suppliers.

In addition, plaintiffs claim that Commerce erred in accepting the depreciation expenses reported by FESILVEN. Defendant agrees, and requests that the court remand this issue to Commerce for redetermination.

## DISCUSSION

■ This court shall uphold Commerce's final determination in an antidumping duty investigation unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

**1. Whether Commerce properly treated FESILVEN and related parties as a single entity.**

■ Plaintiffs assert that Commerce may not treat FESILVEN and its related suppliers as a single entity in the antidumping duty investigation unless Commerce also treats FESILVEN and CVG as a single entity in the companion countervailing duty investigation. In the countervailing duty investigation of ferrosilicon from Venezuela, Commerce treated FESILVEN and CVG as separate entities for the purpose of determining whether export subsidies were conferred

upon the production of ferrosilicon. *See Final Affirmative Countervailing Duty Determination: Ferrosilicon From Venezuela; and Countervailing Duty Order for Certain Ferrosilicon From Venezuela,* 58 Fed.Reg. 27,539 (Dep't Comm.1993). Plaintiffs claim it was arbitrary and contrary to law for Commerce to treat the same related parties inconsistently in the companion antidumping duty and countervailing duty investigations.

The court disagrees. Although both antidumping and countervailing duty laws are designed to counter unfairly-traded imports and there are similarities between the two types of investigations, these laws are directed at different types of unfair trade practices, and therefore, are often concerned with different issues. A countervailing duty is imposed upon imported merchandise to offset a bounty or grant that has been directly or indirectly bestowed by a foreign government upon "the manufacture or production or export" of the merchandise. *See* 19 U.S.C. § 1303(a)(1) (1988). Thus, for a subsidy to be countervailable, there must be a showing that the subsidy has benefitted "the manufacture or production or export" of the merchandise. Accordingly, in a countervailing duty investigation Commerce does not automatically treat the related parties as a single entity or as separate entities. *See Armco Inc. v. United States,* 14 CIT 211, 221, 733 F.Supp. 1514, 1522 (1990). Commerce's investigation, rather, focuses on whether a government subsidy has affected the production or export of the merchandise.

In comparison, in an antidumping duty investigation, Commerce must determine whether imported merchandise is sold in the United States at less than its fair value. *See* 19 U.S.C. § 1673 (1988). This determination is made by comparing the United States price with the foreign market value (FMV) of the merchandise. In determining the FMV, Commerce often must decide how to treat transactions between related parties, as prices of related party transactions tend to be distorted and not to reflect the true cost of production. Commerce is guided by different statutory and regulatory provisions on the treatment of related party transactions

within different contexts of the antidumping law.

For example, Commerce may determine the FMV based on a sale to a related person only if satisfied that the price of the sale is comparable to a non-related party. *See* 19 C.F.R. § 353.45(a) (1994). For the purpose of this regulation, a related person is defined by following the statutory definition of "exporter" under 19 U.S.C. § 1677(13) (1988).[1] In comparison, where Commerce is required to construct the value of the merchandise because the home market price of the merchandise cannot be determined or should not be used as the basis for the FMV, for the purpose of determining the constructed value, Commerce may disregard transactions between related persons as defined in 19 U.S.C. § 1677b(e)(4) (1988).[2] *See* 19 U.S.C. §§ 1677b(a)(2), 1677b(b), 1677b(e) (1988).

Thus, even within antidumping law, the tests for "related parties" may vary according to the purpose of the inquiry. Given that antidumping and countervailing duty laws are two different laws, absent a showing that Congress specifically intended otherwise, Commerce's treatment of related party transactions in an antidumping investigation need not be the same as in a companion countervailing duty investigation. *Cf. American Alloys, Inc. v. United States*, 30 F.3d 1469, 12 Fed.Cir. (T) —— (1994) (finding

Congress specifically intended to harmonize treatment of foreign tax rebates under both antidumping and countervailing duty statutes). Plaintiffs have not cited any statute, regulation, or case law that requires Commerce to accord identical treatment of a related party transaction in both investigations.

In this case, the issue of related party transactions arises in the context of Commerce's calculation of FESILVEN's COP. In determining the FMV, Commerce is required by statute to disregard sales below COP if such sales are made over an extended period of time, in sufficient number, and are not at prices permitting recovery of all costs within a reasonable period of time. 19 U.S.C. § 1677b(b). The statute, however, does not address the treatment of related party transactions for calculating COP. Where

Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104

1. Section 1677(13) provides:

> For the purpose of determining United States price, the term 'exporter' includes the person by whom or for whose account the merchandise is imported into the United States if—
>
> (A) such person is the agent or principal of the exporter, manufacturer, or producer;
>
> (B) such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in the business of the exporter, manufacturer, or producer;
>
> (C) the exporter, manufacturer, or producer owns or controls, directly or indirectly, through stock ownership or control or otherwise, any interest in any business conducted by such person; or
>
> (D) any person or persons, jointly or severally, directly or indirectly, through stock ownership or control or otherwise, own or control in the aggregate 20 percent or more of the voting power or control in the business carried on by the person by whom or for whose account the merchandise is imported

> into the United States, and also 20 percent or more of such power or control in the business of the exporter, manufacturer, or producer.

19 U.S.C. § 1677(13).

2. Section 1677b defines related persons as:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
>
> (B) Any officer or director of an organization and such organization.
>
> (C) Partners.
>
> (D) Employer and employee.
>
> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
>
> (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

19 U.S.C. § 1677b(e)(4).

S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnotes omitted).

■ In treating related party transactions for the purpose of calculating COP, Commerce's policy is to follow generally accepted accounting principles (GAAP). *See* (Def.'s Pub.App.Ex. 1, Import Admin. Pol'y Bull. No. 94.4, Mar. 25, 1994, at 1); *See, e.g., Final Determination of Sales at Less Than Fair Value: Sweaters Wholly or in Chief Weight of Man–Made Fiber From the Republic of Korea,* 55 Fed.Reg. 32,659, 32,669 (Dep't Comm.1990); *Final Determination of Sales at Less Than Fair Value: Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany,* 54 Fed.Reg. 18,992, 19,074–75 (Dep't Comm.1989). This policy appears to conform with the following passage contained in the legislative history of 19 U.S.C. § 1677b(b):

[I]n determining whether merchandise has been sold at less than cost, the Secretary will employ accounting principles generally accepted in the home market of the country of exportation if he is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise.

Trade Reform Act of 1973, H.R.Rep. No. 571, 93d Cong., 1st Sess. 71 (1973).

According to Commerce, under GAAP adopted in virtually all countries:

[E]conomic activities are consolidated for all companies that have direct or indirect common ownership of greater than fifty percent. A consolidation is performed to eliminate the effects of all intercompany transactions.

. . . .

Applying the above accounting principle in determining a company's cost of production as used for dumping purposes, *the actual costs of production should be used to value inputs acquired from companies that are directly or indirectly related by more than fifty percent.* For those companies directly or indirectly owned fifty percent or less, inputs should be valued using transfer prices, unless control of one party over the other can otherwise be demonstrated.

(Def.'s Pub.App.Ex. 1, at 1–2.) (emphasis added).

During the period of investigation, CVG owned more than fifty percent of FESILVEN, and of its related suppliers. *See* (Conf.Doc. 17, Letter from FESILVEN's Counsel to Sec. of Commerce, Dec. 18, 1992, at Fiche 35, Fr. 90); (Conf.Doc. 30, FESILVEN's Sales Verification, Mar. 22, 1993, at Fiche 43, Fr. 97.) In accordance with GAAP and its prior practice, Commerce treated FESILVEN and its related suppliers as a single entity for the purpose of calculating FESILVEN's COP. The court holds that Commerce's determination is supported by substantial evidence in the record and is consistent with law.

**2. Whether Commerce properly used actual costs of related suppliers in determining FESILVEN's COP.**

■ Having concluded that FESILVEN and its related suppliers constituted a single entity, Commerce evaluated FESILVEN's inputs purchased from its related suppliers based on the costs of the suppliers rather than on the transfer prices from the suppliers to FESILVEN. Where FESILVEN's related suppliers purchased inputs from other related parties within the CVG group, Commerce accepted transfer prices as the basis for calculating the costs to FESILVEN's suppliers. Commerce explained:

The Department's normal practice is to accept related supplier costs *based, in part, upon transfer prices between the supplier and its related companies.* In past cases, the Department has departed from this practice by investigating the transfer prices and COPs of the related party's related supplier, as petitioners *imply* is called for here, but we have done so only when petitioners have supplied timely, credible evidence that such an approach was warranted. . . . We note that if petitioners in this investigation wanted the Department to further investigate the potential upstream transfers that they allege are occurring, they should have raised the issue earlier in the proceeding. . . .

*Final Determination,* 58 Fed.Reg. at 27,528 (emphasis added).

Plaintiffs now contend that Commerce may not treat the related party transactions inconsistently within the context of the COP analysis. Plaintiffs agree that, under the circumstances of this case, a full COP analysis encompassing all upstream related party transactions "would have been a complicated, tedious and nearly impossible task because of the highly intertwined nature of the CVG group." (Pls.' Reply Br., at 13.) Plaintiffs contend, however, that if Commerce determines that a case is so complicated that performance of a full COP analysis would not be feasible, Commerce should use transfer prices, rather than use a combination of costs and transfer prices as it did in this case. In support of their position, plaintiffs cite *Certain Internal–Combustion, Industrial Forklift Trucks from Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 3,167 (Dep't. Comm.1992), in which Commerce calculated the COP of the company based on transfer prices rather than actual costs where collecting the actual cost data was not feasible.

Plaintiffs provide little support, however, for their position that Commerce may not use a combination of costs and transfer prices in a COP analysis involving related party transactions. As previously noted, Commerce has a general policy of using "the actual costs of production" to value inputs acquired from companies that are directly or indirectly related by more than fifty percent. *See* (Def.'s Pub.App.Ex. 1, at 2.) Given the difficulty in collecting all the actual cost data, however, it is also Commerce's "normal practice ... to accept related supplier costs based, in part, upon transfer prices between the supplier and its related companies." *Final Determination,* 58 Fed.Reg. at 27,528. Commerce's policy and practice reflect the consideration that it should endeavor to calculate dumping margins as accurately as is feasible within statutory deadlines.

Commerce's determination in *Forklift Trucks from Japan,* 57 Fed.Reg. 3,167, cited by plaintiffs to support their position, appears to be consistent with this consideration. In that case, Commerce applied transfer prices to determine the company's COP where the use of actual cost data was nearly impossible. *Id.* at 3,173–74. Commerce's decision, however, was made after verifying that the transfer prices reported by the company were "sound and reliable." *Id.* at 3,173.

In contrast to *Forklift Trucks from Japan,* Commerce has made no finding, nor do plaintiffs claim, that the transfer prices FESILVEN paid to its related suppliers were sound and reliable. Rather, Commerce verified the accuracy of the actual costs of related suppliers reported by FESILVEN. *See* (Conf. Doc. 28, Adjustments to Calculation of COP, May 3, 1993, at Fiche 42, Frs. 83–88.) Where Commerce found the cost data unsubstantiated, it used BIA to determine these costs. *Final Determination,* 58 Fed.Reg. at 27,532. The court finds Commerce's methodology reasonable. Absent evidence showing that transfer prices were more accurate than verified actual costs, Commerce was not required to depart from its general practice of using actual costs.

**3. Whether Commerce properly calculated general expenses in determining COPs of FESILVEN and its related suppliers.**

■ In calculating COPs of FESILVEN and its related suppliers, Commerce allocated CVG's incurred selling, general, and administrative expenses (SG & A) among these companies. Because Commerce did not receive the financial statements of all of the CVG group members, nor a consolidated group financial statement, it was unable to allocate CVG's actual SG & A to FESILVEN and its related suppliers. *Final Determination,* 58 Fed.Reg. at 27,529. As BIA, Commerce used the amount of fees these companies paid to CVG to cover CVG's management costs. The fees paid to CVG were based on a certain percentage of the operating profits of the companies. Because FESILVEN did not make any operating profit from January to May in 1992, it paid no fee for these five months of the period of investigation. As BIA for each month in which FESILVEN paid no fee, Commerce used the amount of the fee reported for December

1991, the first month of the period of investigation. *Id.* at 27,530.

Plaintiffs claim that Commerce erred in using the management fees paid to CVG as BIA because the management fees were based on profitability of the companies, not on services provided by CVG. Plaintiffs argue that members of the CVG group benefitted from CVG's services regardless of the extent of their profitability in any given year; therefore, the fees paid had no relationship to the costs that CVG incurred in providing services to these companies. Plaintiffs further contend that Commerce randomly picked the fee paid by FESILVEN in December 1991 as BIA, and that this choice of BIA is inappropriate.

Plaintiffs' arguments are unpersuasive. Commerce already incorporated petitioners' concerns into its analysis. Although FESILVEN paid no fee to CVG during the first five months of 1992, Commerce still allocated a portion of CVG's SG & A to FESILVEN for the period of investigation by resorting to BIA. Commerce chose the fees FESILVEN paid for December 1991 as BIA for each subsequent month in which it did not pay such a fee. *Id.*

■ Although the statute mandates Commerce to use BIA whenever a party refuses or is unable to provide information requested, it does not explicitly define what constitutes the "best" information. *See* 19 U.S.C. § 1677e(c) (1988). Hence, Commerce is granted some measure of discretion as to its selection of BIA. *Allied–Signal Aerospace Co. v. United States,* 11 Fed.Cir. (T) ——, ——, 996 F.2d 1185, 1191 (1993). Here, Commerce found that CVG's general expenditures on its subsidiaries, such as FESILVEN, were more than fully reimbursed by the management fees FESILVEN and the other subsidiaries paid CVG. *Final Determination,* 58 Fed.Reg. at 27,529. Based on the record evidence, the court finds Commerce's conclusion reasonable in the absence of evidence otherwise. *See* (Pub.Doc. 99, CVG 1991 Financial Statement, at Fiche 16, Frs. 42–43); (Conf.Doc. 22, CVG 1992 Interim Financial Statement, at Fiche 38, Fr. 90.)

■ Plaintiffs further claim that Commerce erred in calculating the financing expenses of FESILVEN and its related suppliers. According to plaintiffs, Commerce has a well-established practice of calculating financing expenses based on the borrowing experience of the consolidated group of companies. Because FESILVEN failed to provide either individual or consolidated financial statements, however, Commerce resorted to BIA to allocate the financing expenses of the CVG group. Based on its review of CVG's financial statement, Commerce found that the fees CVG collected from its subsidiaries were sufficient to cover both its SG & A and financing costs. *Final Determination,* 58 Fed.Reg. at 27,530. Consequently, Commerce determined that it was not necessary to include an additional amount for financing expenses. *Id.*

Commerce's determination is again supported by substantial evidence in the record. CVG's financial statement for 1991 shows that CVG's financing expense constituted 0.0028% of the total fees collected from its subsidiaries. (Pub.Doc. 99, at Fiche 16, Fr. 42.) A similarly minuscule percentage is shown in CVG's financial statement for 1992. (Conf.Doc. 22, at Fiche 38, Fr. 90.) Accordingly, the court finds Commerce reasonably concluded that the fees CVG collected from its subsidiaries were sufficient to cover both CVG's SG & A and financing costs, and that no additional amount should be included as the financing expenses of FESILVEN and its related suppliers.

### 4. Whether Commerce properly calculated COPs of related suppliers.

Plaintiffs further contend that Commerce inadequately calculated COPs for several of FESILVEN's related suppliers: EDELCA, FERROMINERA and PROFORCA.

#### (a) EDELCA

■ EDELCA supplied FESILVEN with electricity. In the final determination, Commerce accepted the COP reported for EDELCA based on its finding at verification that, "with the exception of the fees paid to CVG, EDELCA had completely reported its average production costs during the [period

of investigation] (including depreciation)." *Final Determination*, 58 Fed.Reg. at 27,531.

Plaintiffs assert that EDELCA did not report a full COP because the COP reported was significantly lower than the average transfer price reported for the period of investigation. According to plaintiffs, EDEL-CA reported in the companion countervailing duty investigation that it was in the process of imposing rapid rate increases to recover "its long-term average incremental costs." (Pls.' Br., at 34.) The term "long-term average incremental costs" was understood in this context as the long-term marginal generation costs. *Id.* Plaintiffs interpret the "long-term" costs as costs incurred both before and during the period of investigation, but not future costs. *See* (Pls.' Reply Br., at 21 n. 27.) Plaintiffs argue that while EDEL-CA's transfer prices reflect EDELCA's marginal costs for the period of investigation, EDELCA's COP did not.

Defendant counters that, in accordance with the GAAP, Commerce uses average costs, not marginal costs, in determining COP. *See Final Determination*, 58 Fed. Reg. at 27,531. Furthermore, defendant interprets the "long-term costs" as costs relating to EDELCA's investment in building a new generating facility, which is not expected to be operational until 1995, and not the costs incurred during the period of investigation. *See id.*

The court finds defendant's reasoning convincing. Plaintiffs do not dispute that Commerce's standard COP analysis uses average costs, not marginal costs. The record shows that EDELCA increased prices, following the advice of the World Bank to switch its pricing method from one based on "average historical cost" to one based on "long-term marginal generation costs." (Conf.Doc. 32, Pls.' Case Br. before Commerce, at Fiche 43, Frs. 97–98.) In light of this background, it was not unreasonable for Commerce to conclude that EDELCA's "long-term marginal costs" relate to costs associated with future facilities, rather than to costs incurred during the period of investigation. In any event, EDELCA's COP for the period of investigation has been verified by Commerce. *See* (Conf.Doc. 28, at Fiche 42, Frs. 83–85.)

Plaintiffs further assert that EDELCA's depreciation was substantially under-reported. Defendant responds that plaintiffs appear to have misunderstood the distribution of the reported depreciation in EDELCA's financial statements. According to defendant, EDELCA distributed its depreciation expense among several cost categories: generation, transmission, and general and administrative costs. Defendant contends that plaintiffs mistakenly compare the depreciation for one category (generation) to the total amount shown on EDELCA's financial statements.

Upon reviewing the administrative record, the court has found no significant discrepancy between the amount of depreciation costs estimated by plaintiffs and that calculated by Commerce. (Conf.Doc. 22, Cost Verification Report, at Fiche 57, Frs. 15–16); (Pub.Doc. 102, 1991 Edelca Financial Statement, at Fiche 18, Frs. 83, 87.) Accordingly, the court affirms Commerce's determination in this respect.

### (b) FERROMINERA

In its final determination, Commerce accepted FERROMINERA's financial data based on the cost of goods sold in order to calculate the company's COP. 58 Fed.Reg. at 27,532. Plaintiffs contend that Commerce should calculate COP based on cost of goods manufactured rather than cost of goods sold. Plaintiffs argue that Commerce's acceptance of cost of goods sold was inconsistent with its rejection of FESILVEN's originally reported data which were based on the cost of goods sold. According to plaintiffs, using cost of goods sold results in inaccurate accounting of COP, because such cost includes the cost of the beginning inventory of finished product, which reflects the historical cost to produce the product, but not any cost increases during the period of investigation.

Commerce addressed both of plaintiffs' arguments in its final determination:

[T]he Department has found [cost of goods sold] to be an appropriate source for cost data in the past. Moreover, in this case, given FERROMINERA's small inventory level, we do not believe that use of [cost of

goods sold] results in distortion of the margin analysis performed for the final determination. Accordingly, we have accepted the data reported.

*Id.*

Plaintiffs do not dispute that Commerce sometimes accepts "cost of goods sold" as the basis for calculating COP, nor do they challenge Commerce's finding that FERROMINERA's inventory was small. The court finds that Commerce acted within its discretion in accepting FERROMINERA's reported costs, and that Commerce has provided a reasonable explanation for its approach.

### (c) PROFORCA

Plaintiffs contend that PROFORCA's COP was under-reported because it did not include expenses associated with the collection and storage of the woodchips. In its final determination, Commerce accepted PROFORCA's transportation costs of woodchips as the only component of PROFORCA's COP, based on its finding that woodchips were a waste product of the company's lumber production. 58 Fed.Reg. at 27,532. In determining the cost of by-products, Commerce considers only "incremental costs incurred to produce or sell the product ... because by-products are products which result from the manufacturing of the primary product and have little residual value." *Id.* Commerce found that the only incremental cost PROFORCA incurred was the cost associated with transportation of woodchips to FESILVEN's factory. *Id.*

The court finds Commerce's determination is supported by substantial evidence in the record. Commerce confirmed at verification

that woodchips were produced when the log was made into boards. (Conf.Doc. 28, at Fiche 42, Fr. 85.) The company routinely stored the woodchips in a silo to keep the chips out of the production area; unless the woodchips were sold, the company would hire a trucking company to move the chips to a dump each time the silo was filled up. *Id.* Therefore, Commerce acted reasonably in concluding that the only cost associated with PROFORCA's producing and selling the woodchips was the cost of transporting the woodchips to FESILVEN's factory.

### CONCLUSION

The court holds that Commerce's determination is supported by substantial evidence in the record and is in accordance with law in all the aspects discussed in the foregoing opinion. With respect to the calculation of FESILVEN's depreciation cost, the court grants the requests of the parties and remands the issue to Commerce for redetermination as to whether FESILVEN's depreciation costs should be based on the revalued amount shown in FESILVEN's financial statements.

Commerce is directed to file its remand determination within 60 days of this opinion. Any comments on Commerce's remand determination shall be filed with the court within 45 days thereafter.