**FEDERAL–MOGUL CORPORATION, Plaintiff and Plaintiff–Intervenor,**

**The Torrington Company, Plaintiff and Plaintiff–Intervenor,**

v.

**UNITED STATES, Defendant,**

SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB; SNR Roulements; Meter S.p.A.; NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH; NSK Ltd. and NSK Corporation; Emerson Power Transmission Corporation; INA Walzlager Schaeffler KG and INA Bearing Company, Inc.; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; RHP Bearings and RHP Bearings Inc.; NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd., NMB Thai Ltd.

and Pelmec Thai Ltd.; FAG Kugelfischer Georg Schafer KGaA, FAG Italia, S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation, Defendant–Intervenors.

Slip Op. 96–37.
Court No. 93–08–00461.

United States Court of International Trade.

Feb. 13, 1996.

Frederick L. Ikenson, P.C., Washington, DC (Frederick L. Ikenson, Washington, DC, Larry Hampel, Silver Springs, MD and Joseph A. Perna, V, Springfield, PA) for plaintiff and plaintiff-intervenor Federal–Mogul Corporation.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Wesley K. Caine, William A. Fennell, Geert de Prest, John M. Breen, Lane S. Hurewitz, Myron A. Brilliant, Patrick J. McDonough and Amy S. Dwyer) for plaintiff and plaintiff-intervenor The Torrington Company.

Frank W. Hunger, Assistant Attorney General; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jeffrey M. Telep, of counsel: Michelle Behaylo, Stacy J. Ettinger, Thomas H. Fine, Anna Park, Alexandra Levinson and David Ross), Washington, DC, for defendant.

Howrey & Simon (Herbert C. Shelley, Alice A. Kipel, Anne Talbot and Patricia M. Steele), Washington, DC, for defendant-intervenors SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB.

Grunfeld, Desiderio, Lebowitz & Silverman, New York City (Bruce M. Mitchell) for defendant-intervenor SNR Roulements.

Steptoe & Johnson, Washington, DC (W. George Grandison and Maury D. Shenk) for defendant-intervenor Meter S.p.A.

Barnes, Richardson & Colburn, Chicago, IL (Donald J. Unger, Kazumune V. Kano and Lawrence M. Friedman) for defendant-intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH.

Lipstein, Jaffe & Lawson, L.L.P., Washington, DC (Robert A. Lipstein, Matthew P. Jaffe and Grace W. Lawson) for defendant-intervenors NSK Ltd. and NSK Corporation.

Baker & McKenzie, Washington, DC (Kevin M. O'Brien, Michael A. Lawrence and Sandra E. Chavez) for defendant-intervenor Emerson Power Transmission Corporation.

Arent Fox Kintner Plotkin & Kahn, Washington, DC (Stephen L. Gibson and Peter L. Sultan) for defendant-intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc.

Powell, Goldstein, Frazer & Murphy, Washington, DC (Peter O. Suchman, Neil R. Ellis, Robert A. Calaff and Susan M. Mathews) for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.

Covington & Burling, Washington, DC (Harvey M. Applebaum, David R. Grace and Mark F. Kightlinger) for defendant-intervenors RHP Bearings and RHP Bearings Inc.

White & Case, Washington, DC (Walter J. Spak, William J. Clinton, David E. Bond and Edmund W. Sim) for defendant-intervenors NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd., NMB Thai Ltd. and Pelmec Thai Ltd.

Grunfeld, Desiderio, Lebowitz & Silverman, New York City (Max F. Schutzman, Andrew B. Schroth and Mark E. Pardo) for defendant-intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Italia, S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation.

## OPINION

TSOUCALAS, Judge:

Plaintiffs, Federal–Mogul Corporation ("Federal–Mogul") and The Torrington Company ("Torrington"), commenced this action challenging certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of administrative review entitled *Final Results of Antidumping Duty Administrative Reviews and Revocation in Part of an Antidumping Duty Order ("Final Results")*, 58 Fed.Reg. 39,729 (1993), as amended, *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 42,288 (1993), *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France and the United Kingdom; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 58 Fed.Reg. 51,055 (1993), and *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Amendment to Final Results of Antidumping Duty Administrative Reviews*, 59 Fed.Reg. 9,469 (1994).

### Background

On April 27, 1993, Commerce published the preliminary results of its administrative review of antidumping duty orders on antifriction bearings ("AFBs") (other than tapered roller bearings) and parts thereof from Japan, France, Germany, Italy, Romania, Singapore, Sweden, Thailand and the United Kingdom. *See Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Preliminary Results of Antidumping Duty, Administrative Reviews and Partial Termination of Administrative Reviews*, 58 Fed.Reg. 25,616 (1993).

On July 26, 1993, Commerce published the Final Results at issue. *See Final Results*, 58 Fed.Reg. at 39,729. Federal–Mogul and Torrington now move pursuant to Rule 56.2 of the Rules of this Court for judgment on the agency record alleging the following ac-

tions by Commerce were unsupported by substantial evidence on the agency record and not in accordance with law: (1) adjusting United States price ("USP") by adding an amount for taxes incurred on sales in the home market; (2) refusing to find that below-cost transfer pricing constituted reimbursement of antidumping duties to be subtracted from exporter's sales price ("ESP"); (3) using constructed value to calculate foreign market value ("FMV") for certain bearings; (4) calculating inventory carrying costs for ESP sales based upon transfer prices; (5) refusing to recognize certain home market sales as being "similar" to U.S. models; (6) failing to reallocate Meter S.p.A.'s ("Meter") claimed U.S. warranty expenses which were not tied to specific sales; (7) allocating NSK Ltd. and NSK Corporation's (collectively "NSK") indirect expenses over sales to all U.S. customers; (8) including below-cost sales in calculating profit for purposes of determining constructed value; (9) using two different methodologies for the assessment of antidumping duties and for the establishment of future cash deposit rates; (10) adjusting FMV for pre-sale inland freight expenses; (11) refusing to deduct resale profit from ESP; (12) treating home market rebates, discounts and billing adjustments as indirect selling expenses; (13) including certain below-cost sales in its calculation of FMV; (14) using weighted-average entered value data to determine whether to exclude the sales of Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. (collectively "Koyo") pursuant to the "Roller Chain" rule; (15) accepting selling expenses reported on the basis of transfer prices by NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corp., NTN Corporation and NTN Kugellagerfabrik (Deutschland) GmbH (collectively "NTN"); (16) adjusting NTN's USP for interest paid on cash deposits of antidumping duties; (17) refusing to deduct liaison expenses from ESP; (18) treating NTN's aftermarket sales as a separate level of trade; (19) using quantity rather than weight as a measure of home market viability; (20) treating "Route B," bonded warehouse, and dollar-denominated sales of NMB Singapore Ltd., Pelmec Industries (Pte.) Ltd., NMB Thai Ltd. and Pelmec Thai Ltd. (collectively

"NMB/Pelmec") as home market sales; (21) including NMB/Pelmec's Thailand sales to related parties in the calculation of profit for constructed value; and (22) committing various clerical errors.

### Discussion

The Court's jurisdiction in this action is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

The Court must uphold Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on the grounds of a differing interpretation of the record." *Timken Co. v. United States*, 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd*, 894 F.2d 385 (Fed.Cir.1990).

### 1. *Tax Adjustments*

Federal–Mogul and Torrington object to Commerce's attempt to achieve tax neutrality by adding to USP the amount of tax paid on home market sales rather than the actual tax forgiven on export sales. *Brief of Federal–Mogul Corporation in Support of its Motion for Judgment Upon the Agency Record* ("*Federal–Mogul's Brief*") at 5–7; *Memorandum in Support of The Torrington Company's Motion for Judgment Upon the Administrative Record* ("*Torrington's Brief*") at 102–05. Federal–Mogul and Torrington contend that Commerce's approach is inconsistent with 19 U.S.C. § 1677a(d)(1)(C) (1988). Commerce agrees that a remand is necessary to apply a new tax methodology. *Defendant's Memorandum in Opposition to the Motion of Federal–Mogul Corporation for Judgment Upon the Agency Record* ("*Commerce's Brief I*") at 5–8; *Defendant's*

Memorandum in Opposition to the Motions of The Torrington Company and Federal–Mogul Corporation for Judgment Upon the Agency Record ("Commerce's Brief II") at 56–58.

■ In *Federal–Mogul Corp. v. United States*, 63 F.3d 1572 (Fed.Cir.1995), the Court of Appeals for the Federal Circuit ("CAFC") upheld Commerce's tax-neutral methodology. Specifically, the CAFC stated the following:

> [I]n administering the Act, the Agency over the years has pursued a policy of attempting to make the tax adjustment called for by the Act tax-neutral. We conclude that Commerce's long-standing policy of attempting tax-neutrality in its administration of this provision is not precluded by the language of § 1677a, nor do we find the particular proposed methodology to be an unreasonable way to pursue that policy in light of the statutory language.

*Federal–Mogul*, 63 F.3d at 1580. In light of the decision of the CAFC in *Federal–Mogul*, the Court finds that a remand for Commerce to apply a new methodology is unnecessary. Commerce's approach of adding to USP the amount of tax paid on home market sales is in accordance with the decision of the CAFC in *Federal–Mogul* and, therefore, sustained.

### 2. *Reimbursement of Antidumping Duties*

Federal–Mogul and Torrington argue that Commerce erred by failing to deduct from ESP antidumping duty reimbursements. Specifically, Federal–Mogul and Torrington assert that whenever a foreign manufacturer sells merchandise to a related U.S. importer at prices below cost plus profit or alternatively, below cost, the transaction should be regarded as a transfer of funds to the extent that prices are less than the benchmark. Accordingly, Federal–Mogul and Torrington maintain that these transfer prices should be treated as duty reimbursements to the extent that dumping margins are found and should be deducted from USP pursuant to 19 C.F.R. § 353.26(a) (1993). *Federal–Mogul's Brief* at

7–11; *Torrington's Brief* at 47–56. Both Federal–Mogul and Torrington further contend that 19 C.F.R. § 353.26(a) applies in ESP situations. *Federal–Mogul's Brief* at 9; *Torrington's Brief* at 50–54.

Federal–Mogul further supports its contentions by suggesting that the antidumping law "collapses" related entities in ESP situations into one entity. *Federal–Mogul's Brief* at 9–10. According to Federal–Mogul, payment by the ESP importer is actually payment by the producer on behalf of the importer and, therefore, such payments are covered by the reimbursement regulation at issue. *Id.*

In response, Commerce claims that the reimbursement regulation does not apply to related parties in an ESP situation. *Commerce's Brief II* at 15–17. Commerce cites the definition of "exporter" contained in 19 U.S.C. § 1677(13)[1] to support its argument that in an ESP situation, where the importer and the related producer are treated as one entity, that entity cannot reimburse itself pursuant to 19 C.F.R. § 353.26(a). Furthermore, Commerce submits that even if the reimbursement regulation applies to ESP sales, there is no evidence that the foreign manufacturer reimbursed the U.S. importer for antidumping duties. *Commerce's Brief II* at 17.

The reimbursement regulation, 19 C.F.R. § 353.26, which governs this issue, reads in part as follows:

> (a) *In general.* (1) In calculating the United States price, the Secretary will deduct the amount of any antidumping duty which the producer or reseller:
>
> (i) Paid directly on behalf of the importer; or
>
> (ii) Reimbursed to the importer.

The Court has interpreted this regulation to require evidence beyond mere allegation that the foreign manufacturer either paid the antidumping duty on behalf of the U.S. importer, or reimbursed the U.S. importer for its payment of the antidumping duty. *Torring-*

---

1. 19 U.S.C. § 1677(13) (1988) states in pertinent part as follows: "For the purpose of determining United States price, the term 'exporter' includes the person by whom or for whose account the merchandise is imported into the United States ..."

*ton Co. v. United States,* 19 CIT ——, ——, 881 F.Supp. 622, 631 (1995).

In the Final Results, Commerce stated the following with respect to its decision not to apply the reimbursement regulation:

As stated in AFBs II, 57 FR at 28371, the antidumping statute and regulations make no distinction in the calculation of USP between costs incurred by a foreign parent company and those incurred by its U.S. subsidiary. Therefore, the Department does not make adjustments to U.S. price based upon intracompany transfers of any kind. Indeed, the Department has a long-standing practice of denying adjustments for intracompany payments on the grounds that, because affiliated companies are a single entity for the purposes of antidumping law, payments from a parent company to its subsidiary are not expenses to the consolidated corporation as a whole. [B]ecause we treat a foreign producer and its U.S. subsidiary as a single entity for all purposes in calculating weighted-average margins, we cannot treat the two companies as separate entities for purposes of the duty payment. The governing statute and regulations do not contemplate applying the reimbursement provision to related parties in an ESP situation.

*Final Results,* 58 Fed.Reg. at 39,736 (citations omitted). In *Torrington,* 19 CIT at ——, 881 F.Supp. at 631–32, this Court upheld Commerce's decision not to apply the reimbursement regulation based upon the same reasoning provided by Commerce in the case at bar. The Court held that because Torrington failed to produce evidence linking the intracorporate transfers to the reimbursement of antidumping duties, Commerce was not required to make a deduction to USP for antidumping duty reimbursement. *Id.* at ——, 881 F.Supp. at 632.

In the present case, Torrington again fails to establish a link between intracorporate transfers and the reimbursement of antidumping duties. Torrington's arguments based on theories concerning international transfer pricing do not amount to more than mere allegation and, therefore, are insufficient to meet the requirements of the reimbursement regulation. *See Torrington's Brief* at 47–48. As such, the Court sustains Commerce's decision not to adjust USP based upon intracompany transfers.

3. *Use of Constructed Value to Calculate FMV*

Federal–Mogul contends that Commerce improperly resorted to use of constructed value without considering sales of similar merchandise. *Federal–Mogul's Brief* at 11–14. According to Federal–Mogul, if Commerce is unable to use sales of identical merchandise to compute FMV because of extensive below-cost sales, the statute requires Commerce to calculate FMV on the basis of similar merchandise before resorting to constructed value. *Id.* at 12–14. To support its position, Federal–Mogul relies on the court's decision in *Timken Co. v. United States,* 10 CIT 86, 95, 630 F.Supp. 1327, 1336 (1986) (holding that Commerce abused its discretion by failing to collect data concerning respondent's selection of similar merchandise).

Commerce responds that once it determined that over 90% of home market sales of matched bearings were made at below cost over an extended period of time, Commerce properly resorted to constructed value to compute FMV pursuant to 19 U.S.C. § 1677b(b) (1988). *Commerce's Brief I* at 13–18. Commerce maintains that the statute grants Commerce the authority to determine what constitutes "such or similar merchandise" under 19 U.S.C. § 1677(16) (1988) and expresses a preference for the use of identical merchandise over similar merchandise. *Id.* at 16. Commerce further argues that the determination of "such or similar merchandise" is made solely on the basis of the physical similarity of the merchandise and without regard to the cost of the merchandise. As such, Commerce claims that once it disregards home market sales as being below cost, the statute requires Commerce to resort immediately to constructed value rather than determine the next most similar match with above-cost sales. *Id.* at 16–17.

In support of Commerce, FAG Kugelfischer Georg Schafer KGaA, FAG Italia, S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corpora-

tion and The Barden Corporation (collectively "FAG"), defendant-intervenors, argue that 19 U.S.C. § 1677(16) establishes a "such or similar" hierarchy which requires Commerce to match the U.S. product to either an identical or similar foreign market based solely on the physical similarity of the goods before applying the below-cost test. *Memorandum of Defendant–Intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Italia .S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("FAG's Brief I")* at 16. FAG submits that if a match is found due to physical similarities, then the statute requires Commerce to conduct a below-cost test under 19 U.S.C. § 1677b(b). *FAG's Brief I* at 16–17. According to FAG, if a substantial number of the models are sold at below-cost prices over an extensive period of time, then the statute instructs Commerce to employ constructed value without returning to the "such or similar" analysis. *Id.* at 17–18.

In further support of Commerce, NTN, defendant-intervenor, points out that the methodology used by Commerce is consistent with its longstanding practice. *Brief of NTN Corporation and NTN Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Kugellagerfabrik in Response to Plaintiffs' Rule 56.2 Motion for Judgment Upon the Agency Record ("NTN's Brief I")* at 6. NTN emphasizes that Commerce's reasonable interpretation of the statute cannot be overridden by Federal–Mogul's alternative even if it appears to be reasonable. *NTN's Brief I* at 8.

Emerson Power Transmission Corporation ("Emerson"), defendant-intervenor, distinguishes *Timken*, 10 CIT at 95–96, 630 F.Supp. at 1336–37, from the case at bar, arguing that *Timken* concerns using similar merchandise when there are no values for such merchandise. *Defendant–Intervenor Emerson Power Transmission Corporation's Memorandum in Opposition to Plaintiffs' Motions for Judgment Upon the Administrative Record ("Emerson's Brief")* at 10–11.

The statute defines FMV as the price at which "such or similar merchandise" is sold in the home market or to third countries. 19 U.S.C. § 1677b(a)(1) (1988). "Such or similar merchandise" is defined in 19 U.S.C. § 1677(16) as follows:

The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which a determination for the purposes of part II of this subtitle can be satisfactorily made:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation.

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

In the Final Results, Commerce stated the following regarding its decision to resort to constructed value to compute FMV:

We disagree with Federal–Mogul's and Koyo's contention that the statute and regulations express a preference for price-to-price comparisons such that, in the event that a "matched" home market model forms an inadequate FMV because of extensive below-cost sales, the Department should calculate FMV based on the prices of the next most similar merchandise before resorting to CV [constructed value].

We first note that this issue arises only in situations where *all* home market sales

of a model are disregarded due to the below-cost test. Under our current methodology, we disregard all home market sales of a model from our analysis and immediately resort to CV if more than 90 percent of the sales of that model were made below cost over an extended period of time, and are not at prices that permit recovery of all costs within a reasonable period of time in the normal course of trade.

. . . .

... [B]ecause section 771(16) specifies that the determination of such or similar merchandise depends solely on the similarity of the merchandise and not on whether the most similar model is sold above cost, our resort to CV, after finding the most similar model and then determining that it is sold below cost in over 90 percent of home market sales, does not conflict with this provision.

58 Fed.Reg. at 39,765.

■ The Court finds that Commerce's interpretation of the statute is reasonable. Sections 1677b(a)(1) and 1677(16) have been interpreted by the court to create a hierarchy of proper comparisons between merchandise sold in the home market and merchandise sold in the foreign market. *See Timken,* 10 CIT at 95–96, 630 F.Supp. at 1336–37. Pursuant to the statute, Commerce must first select merchandise in the home market that is identical to merchandise sold in the United States. If identical merchandise is not available, then Commerce must select merchandise sold in the home market that is "approximately equal in value to the merchandise sold in the United States." *Id.* at 96, 630 F.Supp. at 1336. However, *Timken* involved a situation where Commerce failed to consider whether the respondent provided data for the most similar merchandise. *Id.* at 98, 630 F.Supp. at 1338. The court's concern in *Timken* was Commerce's abdication of its responsibility to determine whether the merchandise compared was the most similar merchandise sold in the home market. *Id.* This is not the issue in the case at bar since Commerce used its authority to determine which model sold in the home market was the best match for the model sold in the foreign market.

Commerce found a match based upon the physical characteristics of the merchandise, which is the first category in the hierarchy established by the statute for the determination of "such or similar merchandise." *Final Results,* 58 Fed.Reg. at 39,765. Once Commerce finds a match, it need not consider the rest of the categories because the statute specifically directs Commerce to base its determination of what constitutes "such or similar merchandise" on the "first of the ... categories." 19 U.S.C. § 1677(16). Once Commerce found a match and determined that over 90% of the home market sales were made at below cost, Commerce properly resorted to constructed value pursuant to 19 U.S.C. § 1677b(b) which provides the following:

Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market ... have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. *If the administering authority determines that sales made at less than cost of production—*

(1) have been made over an extended period of time and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade

*such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than the cost of production, are determined to be inadequate as a basis for the determination of foreign market value under subsection (a) of this section, the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.*

(Emphasis added). There is no requirement in 19 U.S.C. § 1677b(b) that Commerce first investigate whether it can make another match based on the next most similar merchandise before resorting to constructed value. Once a match was identified based on the physical characteristics of the merchandise, the fact that 90% of the matched sales were made at less than the cost of production justified Commerce's use of constructed value. Commerce's approach is supported by the court's decision in *Zenith Elecs. Corp. v. United States,* 18 CIT ——, ——, 872 F.Supp. 992, 998–1000 (1994). In *Zenith,* the court rejected the argument that if any merchandise meeting one of the definitions of "such or similar merchandise" survives the cost of production test under 19 U.S.C. § 1677b(b), Commerce should use the actual prices of such merchandise rather than resort to constructed value. In upholding Commerce's decision to use constructed value, the court stated the following:

> Once the model matches are established and the COP [cost of production] test is completed, Commerce is not required to re-examine all of the undifferentiated model data in order to make new matches and price comparisons on the basis of whatever subset of lower-ranked such or similar merchandise survives the COP test. Section 1677b(b) does not direct such a result.

*Zenith,* 18 CIT at ——, 872 F.Supp. at 1000. Accordingly, the Court sustains Commerce's determination on this issue.

### 4. *Inventory Carrying Costs*

In this review, Commerce adjusted FMV for inventory carrying costs. *Final Results,* 58 Fed.Reg. at 39,744. In calculating inventory carrying costs, Commerce relied upon transfer prices. *Id.* In addition, Commerce used the home market interest rate for the time period during which the merchandise was held by the foreign manufacturer, and the United States interest rate for when the merchandise was in transit or held by the United States affiliate. *Id.*

Both Federal–Mogul and Torrington object to Commerce's adjustment to FMV for inventory carrying costs. Torrington urges the Court to reconsider its decision uphold-ing Commerce's adjustment to FMV for inventory carrying costs as a reasonable exercise of Commerce's discretion. *Torrington's Brief* at 89 (citing *Torrington Co. v. United States,* 17 CIT 199, 215, 818 F.Supp. 1563, 1577 (1993)). According to Torrington, inventory carrying costs are incurred only in exporter sales price ("ESP") transactions and not in home market sales. *Torrington's Brief* at 89–98. In support of its position, Torrington points out that 19 U.S.C. § 1677a(e) (1988) requires Commerce to deduct from ESP selling expenses incurred "by or for the account of" the related United States importer, while no such adjustment is required in calculating home market price. *Torrington's Brief* at 91. Torrington emphasizes that the adjustment made to ESP is not really for inventory carrying expenses but, rather, for financing costs incurred "for the account of" the U.S. importer by the foreign seller. *Id.* at 91–92. Torrington submits that "by conceiving of the expense as 'inventory carrying' by the *manufacturer,* instead of financing costs 'for the account of' the *importer,* Commerce has lost sight of the foundation for its original adjustment pursuant to 19 U.S.C. § 1677a(e)(2) and made adjustments without statutory authority." *Torrington's Brief* at 92. According to Torrington, contrary to Commerce's claim, an adjustment to home market price for inventory carrying costs does not result in a fair "apples to apples" comparison. *Id.* at 94–98.

Federal–Mogul argues that Commerce's approach is flawed because Commerce applies inconsistent values and rates in the calculation of inventory carrying costs. *Federal–Mogul's Brief* at 14–21. Federal–Mogul contends that transfer prices should not be used in calculating the adjustment to FMV because such prices are inherently suspect. *Id.* at 16. Federal–Mogul further asserts that there is no relation between the price of the merchandise when it is eventually sold and the cost of holding such merchandise prior to sale. *Id.* at 17. Accordingly, Federal–Mogul submits that Commerce improperly relies on sale prices instead of actual costs incurred in the home market to determine pre-sale costs. *Id.* Finally, citing *LMI–La Metalli Industriale, S.p.A. v. United States,* 912 F.2d 455 (Fed.Cir.1990), as authority,

Federal–Mogul maintains that Commerce should eliminate variations in the adjustments due to the interest rates employed. *Federal–Mogul's Brief* at 18–21. Federal–Mogul proposes that Commerce apply to both the home market and the United States market the lowest interest rate found in either market. *Id.* at 18–19.

Commerce urges the Court to adhere to its decision in *Torrington*, 17 CIT at 215, 818 F.Supp. at 1577, upholding Commerce's practice of adjusting FMV for pre-sale home market inventory carrying costs. *Commerce's Brief II* at 49–51. According to Commerce, the adjustment to FMV results in an "apples to apples" comparison of merchandise sold in two markets at a common point in the distribution channel. *Id.* at 52. Commerce further claims that the general language of 19 U.S.C. § 1677a(e)(2) gives Commerce the authority to deduct inventory carrying costs from FMV. *Id.* at 54.

Commerce agrees with Federal–Mogul, however, that this case should be remanded to Commerce to reconsider whether it should recalculate inventory carrying costs using actual costs of the merchandise rather than transfer prices and whether it should apply uniform interest rates. *Id.* at 55; *Commerce's Brief I* at 18–19.

The defendant-intervenors disagree with Commerce, however, and believe that Commerce properly calculated the inventory carrying costs. NTN and FAG cite *Timken Co. v. United States*, 18 CIT ——, ——, 865 F.Supp. 881, 886–87 (1994), to argue that the Court has upheld Commerce's methodology with respect to the interest rates applied. *NTN's Brief I* at 8–9; *FAG's Brief I* at 21. The defendant-intervenors also assert that *LMI–La Metalli* does not support Federal–Mogul's contentions. *See, e.g., Emerson's Brief* at 4–5. INA Walzlager Schaeffler KG and INA Bearing Company, Inc. ("INA")

maintain that Federal–Mogul's proposed methodology is inconsistent with normal commercial practice. *Response of Defendant–Intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc. to Plaintiff Federal–Mogul Corporation's Motion for Judgment Upon the Agency Record* at 6. Finally, SKF USA Inc., SKF France S.A., SKF GmbH, SKF Industrie, S.p.A. and SKF Sverige AB (collectively "SKF") maintain that a remand is inappropriate because Commerce has failed to demonstrate the calculations are unsupported by substantial evidence or otherwise not in accordance with law. *Brief of SKF in Opposition to Federal–Mogul Corporation's Motion for Judgment Upon the Agency Record ("SKF's Brief I")* at 46–51.

■ The CAFC has upheld Commerce's decision to deduct inventory carrying costs from FMV as an indirect selling expense. *Torrington Co. v. United States*, 44 F.3d 1572, 1580–81 (Fed.Cir.1995). Specifically, the CAFC stated the following:

> ITA's practice of deducting inventory carrying costs, measured from the production date, from exporter's sales price and foreign market value comports with section 1677a(e)(2) and regulation 353.56(b)(2). This practice also affords a true "apples-to-apples" comparison. The opportunity cost of holding inventory accrues from the production date and applies to both export and home market sales. ITA may fairly treat this opportunity cost as an indirect selling expense and, thus, deduct it from exporter's sales price and foreign market value.[2]

*Torrington*, 44 F.3d at 1580 (citations omitted). Thus, this Court rejects Torrington's arguments and upholds Commerce's practice of deducting inventory carrying costs from FMV.

---

**2.** 19 U.S.C. § 1677a(e)(2) provides in pertinent part:

> [T]he exporter's sales price shall be adjusted by being reduced by the amount, if any, of—
>
> . . . .
>
> (2) expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise. . . .

19 C.F.R. § 353.56(b)(2) (1993) permits Commerce to deduct indirect selling expenses from FMV as follows:

> In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses . . . incurred in selling such or similar merchandise up to the amount of the expenses . . . incurred in selling the merchandise.

The next issue is whether Commerce's methodology for computing inventory carrying costs is proper. In defending its methodology, Commerce stated the following in the Final Results:

Inventory carrying cost measures the imputed cost incurred by the firm for storing AFBs in inventory. The transfer price reflects the cost of the merchandise as it is entered into inventory and therefore is an accurate basis upon which to calculate the cost to the subsidiary of holding inventory prior to the sale to an unrelated U.S. customer.

We cannot calculate actual cost for inventory carrying costs since these costs are not found in the books of the respondents. Thus, we must look at what the financing cost would have been. The Department's practice in calculating inventory carrying costs for ESP sales is to calculate the cost in two segments-one during which the merchandise is held by the foreign manufacturer and the other when the merchandise is in transit or held by the U.S. affiliate. Because the seller incurs the opportunity cost of holding inventory in both markets, and because we adjust for that cost in the U.S. market, we must also adjust for the same cost in the home market. In calculating such an expense, we must use the appropriate interest rate (i.e., the home market interest rate on the home market side and the U.S. interest rate for the U.S. side).

58 Fed.Reg. at 39,744.

In *LMI–La Metalli*, the CAFC held that imputed interest rates must conform to commercial practice. 912 F.2d at 460. Specifically, the CAFC rejected Commerce's assertion that its methods do not have to conform to commercial practice by stating the following:

This position is internally inconsistent ... because the imputation of credit cost itself is a reflection of the time value of money, and hence commercial practice. The time value of money is not an arbitrary fiction, but must correspond to a dollar figure reasonably calculated to account for such value during the gap period between delivery and payment. If the cost of credit is imputed in the first instance to conform with commercial reality, it must be imputed on the basis of usual and reasonable commercial behavior.

*Id.* The explanation provided by Commerce in the Final Results fails to establish that the imputed interest rate conforms to commercial reality. Commerce does not cite any evidence to support its presumption that to finance inventory carrying costs, the foreign manufacturer and United States affiliate would each borrow at separate interest rates. The Court has upheld Commerce's practice of applying separate interest rates based on a specific set of facts. *See Timken Co.,* 18 CIT at ——, 865 F.Supp. at 886–87. In *Timken Co.,* the foreign company permitted its subsidiary to pay months after the shipment of merchandise and, therefore, the Court found it was reasonable to apply the interest rate of the foreign country since the foreign company incurred lost opportunity expenses. *Id.* In the review at issue, Commerce does not cite any specific facts concerning delayed payments. If such facts exist, then Commerce may determine that its approach was reasonable. However, absent such circumstances, Commerce may determine on remand that it should apply a uniform interest rate. As such, the Court agrees that a remand is appropriate for Commerce to reconsider this issue.

Furthermore, Commerce does not provide adequate reasons for its decision to rely upon transfer prices as opposed to actual costs. There is no evidence that transfer prices, which generally are less reliable than actual cost data, represent the cost of carrying inventory. *See Aimcor, Alabama Silicon, Inc. v. United States,* 18 CIT ——, ——, 871 F.Supp. 455, 460–61 (1994) (noting that Commerce may rely on transfer prices to determine cost of production where the use of actual cost data is nearly impossible, and when Commerce verifies that the reported transfer prices are "sound and reliable"). Accordingly, on remand, Commerce should reconsider its reliance on transfer prices in computing inventory carrying costs.

### 5. *Methodology for Selecting Similar Merchandise*

In the review at issue, Commerce used the following methodology to determine what

constitutes "similar merchandise" for the purpose of price comparisons between the home market and the United States market:

> Pursuant to sections 773(a)(1) and 771(16) of the Tariff Act, our model match methodology first attempts to match a bearing sold in the United States with identical bearings sold in the home market. If we fail to find an identical bearing, we then attempt to match a bearing sold in the United States with "similar" bearings, i.e., bearings within the same "family," sold in the home market. If we fail to find a similar match, we will match a bearing sold in the United States with its constructed value pursuant to section 773(a)(2) of the Tariff Act.

*Final Results*, 58 Fed.Reg. at 39,764. Commerce determined what constituted "similar merchandise" by grouping bearings into families based upon eight defined physical characteristics. Commerce also employed a 20% difmer cap so that bearings having a greater than 20% difference in their variable costs would not be treated as "similar." *Id.*

Federal–Mogul and Torrington both object to Commerce's use of the family model match methodology. *Federal–Mogul's Brief* at 21–25; *Torrington's Brief* at 69–78. Torrington contends that Commerce's definition of "similar merchandise" is unreasonably narrow and resulted in the inappropriate use of constructed value when sales comparisons could have been made. In support of its position, Torrington notes that the antidumping statute prefers sales comparisons to constructed value comparisons. *Torrington's Brief* at 69–71. Federal–Mogul specifically objects to the application of the family model match methodology to Meter since Commerce's approach resulted in no matches. *Federal–Mogul's Brief* at 21–25.

Commerce defends its use of the family model match methodology as an effective means of organizing matches. *Commerce's Brief II* at 33–43. Commerce emphasizes that it has broad discretion in determining what constitutes "similar merchandise." *Id.* at 36–37. Commerce also points out that all interested parties had numerous occasions to comment on Commerce's methodology and that Commerce considered all comments before concluding that the family approach is reasonable. Commerce explains that it relied on comments of interested parties to develop the family model match methodology in which Commerce compares certain physical characteristics to determine when United States and home market AFB models are "similar" for price comparison purposes. *Id.* at 42. Commerce urges the Court to find that this methodology is reasonable and within its discretion.

Defendant-intervenors agree with Commerce's use of the family model match methodology. *See, e.g., Brief of SKF in Opposition to The Torrington Company's and Federal Mogul Corporation's Motions for Judgment Upon the Administrative Record* ("*SKF's Brief II* ") at 59–74.

In *Torrington*, 19 CIT at ——, 881 F.Supp. at 635, the Court upheld Commerce's family model match methodology. In rejecting identical arguments to the ones presented in the case at bar, the Court stated:

> The issue herein is not whether Commerce's model match methodology gives a broad or narrow construction to the term "similar" merchandise. The issue is whether that methodology is supported by substantial evidence and is otherwise in accordance with law. This Court finds that Commerce's model matching methodology was within the broad discretion it is granted to determine "similar merchandise." Torrington has not provided any evidence of unreasonable behavior on the part of Commerce.

*Id.* The Court adheres to its prior decision and finds that Commerce's use of the family model match methodology, including its application to Meter, is in accordance with law and supported by substantial evidence.

### 6. *Meter's United States Warranty Expenses*

In this review, Commerce found Meter's allocation of total U.S. warranty expenses over total U.S. sales value to be reasonable. *Final Results*, 58 Fed.Reg. at 39,743. Federal–Mogul objects to this determination arguing that warranty costs identifiable to one

customer's purchases should be allocated only over that customer's purchases with the remainder allocated over all U.S. sales. *Federal–Mogul's Brief* at 25–27. Federal–Mogul emphasizes that warranty costs are direct selling expenses and that Meter identified warranty expenses for a specific customer. *Id.* at 26–27.

In rebuttal, Commerce notes that warranty expenses for merchandise sold during the period of review are actually incurred and identified after the period of review. As such, Commerce explains that warranty expenses incurred during the period of review are estimated using surrogate warranty costs. *Commerce's Brief I* at 27–28. Although Commerce recognizes that Meter reported repair expenses for a particular United States customer prior to the period of review, Commerce claims that these expenses are not necessarily reflective of the warranty expenses incurred on sales made during the period of review. *Id.* at 29–30. Absent data concerning what proportion of warranty expenses were historically attributable to each particular customer, Commerce claims that there is no support for a presumption that warranty expenses linked with sales made to a particular customer prior to the period of review are a reasonable approximation of warranty costs incurred on behalf of the same customer during the period of review. *Id.* at 30–32.

In response, Federal–Mogul claims that Meter's reporting of repair expenses made to a particular customer over a three year period qualifies as historical data showing a pattern of warranty expenses attributable to sales to a particular customer. *Federal–Mogul Corporation's Reply to the Responses to Federal–Mogul Corporation's Motion for Judgment Upon the Agency Record* at 20–21.

█ Federal–Mogul does not contest Commerce's decision to accept Meter's methodology in general but does so with respect to one specific customer. In its response to Commerce's questionnaire, Meter reported repair expenses incurred on behalf of one specific customer during the three years pri-

or to the period of review. *See Response to Questionnaire Section B* ("*Meter's Response*"), C.R. Document No. 6, Fiche 74, Frames 51–52.[3] Meter reported its warranty expenses incurred during the period of review by dividing total United States warranty expenses by total United States sales value. *See Meter's Response*, C.R. Document No. 6, Fiche 74, Frame 52. In light of the fact that the majority of the warranty expenses reported for the specific customer were not incurred during the period of review, Commerce properly refused to rely on this data to calculate the warranty expenses incurred during the period of review. *See Final Results*, 58 Fed.Reg. at 39,743. It is reasonable for Commerce to conclude that expenses incurred during the three years prior to the review may not be representative of the expenses incurred during the period of review. As such, the Court finds that Commerce's methodology of allocating warranty costs by dividing total U.S. warranty expenses by total U.S. sales value was reasonable and in accordance with law.

### 7. *Allocation of NSK's Indirect Expenses*

Federal–Mogul asserts that Commerce erred in its calculation of USP by failing to reallocate NSK's claimed advertising expenses. *Federal–Mogul's Brief* at 27–29. Federal–Mogul claims that NSK improperly allocated its advertising expenses over total sales rather than over total sales value for original equipment manufacturer ("OEM") customers only. In support of its position, Federal–Mogul cites NSK's questionnaire response which states that advertising promotes NSK's products to OEM customers. *Id.* at 27–28.

Commerce agrees that it erred in allocating NSK's advertising expenses over total sales when the record demonstrates that such expenses were incurred to promote products to OEM customers only. *Commerce's Brief I* at 32–34. Accordingly, Commerce requests a remand to reallocate NSK's United States indirect advertising expenses.

---

**3.** The confidential version of the administrative record is designated "C.R." The public version is designated "P.R."

NSK, defendant-intervenor, asserts that Commerce should not reallocate NSK's advertising expenses. To support its position, NSK states that the advertisements are clearly intended to promote NSK to all end-users and that it would be impossible for NSK to limit the readership of the publications to OEM customers only. *Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for Judgment on the Agency Record* at 18–19.

■ In the Final Results, Commerce did not limit the allocation of NSK's indirect advertising expenses to its sales to United States OEM customers. 58 Fed.Reg. at 39,-742. In its questionnaire response, NSK specifically acknowledged that advertising expenses are designed "to promote all products of NSK to OEM customers." *Response of NSK Ltd. and NSK Corporation to Section B of the Questionnaire*, P.R. Document No. 143, Fiche 62, Frame 14. Furthermore, NSK stated that sales to distributors are only for the aftermarket in the United States. *Response of NSK Ltd. and NSK Corporation to Supplemental Questionnaire for Sections A through C,* P.R. Document No. 301, Fiche 114, Frame 37. In light of the purpose of the advertising expenses, the Court agrees that a remand is necessary for Commerce to reallocate NSK's advertising expenses over total sales to OEM customers only.

### 8. *Use of Below–Cost Sales for Calculation of Profit*

Torrington contends that Commerce improperly included below-cost sales in its calculations of profit for use in constructed value. *Torrington's Brief* at 57–65. In support of its position, Torrington asserts that below-cost sales are outside the ordinary course of trade. *Id.* at 59–60. Torrington points out that below-cost sales are excluded from the calculation of FMV in certain situations pursuant to 19 U.S.C. § 1677b(b). Torrington urges the Court to exclude below-cost sales in situations where constructed value serves as FMV because failure to do so distorts the statutory scheme. *Id.* at 58–59.

In the alternative, Torrington argues that Commerce should have calculated constructed value based on the reported sample sales of such or similar merchandise rather than on class or kind of merchandise. *Torrington's Brief* at 65–68. Torrington asserts that the sample group of home market sales is representative of the profit on sales of the general class or kind of merchandise. *Id.* at 66. Accordingly, Torrington objects to the use of the eight percent statutory minimum where profit figures based upon the sample sales of such or similar merchandise were higher than eight percent. *Id.* at 67. Torrington states that Commerce should have presumed that profit based on the reported sales of such or similar merchandise would be representative of the profit for the general class or kind of merchandise. *Id.* at 67–68.

Commerce responds that the inclusion of below-cost sales in its profit calculations is consistent with 19 U.S.C. § 1677b(e)(1)(B) (1988). *Commerce's Brief II* at 25–26. Commerce points out that the plain language of the statute does not require the exclusion of below-cost sales when determining a profit amount for constructed value. Commerce rejects Torrington's claim that below-cost sales are *per se* outside the ordinary course of trade explaining that Commerce considers a variety of circumstances in determining whether home market sales are outside the ordinary course of trade. *Id.* at 27. According to Commerce, Torrington failed to provide evidence demonstrating that the below-cost sales were outside the ordinary course of trade. *Id.*

Commerce further responds that pursuant to 19 U.S.C. § 1677f–1 (1988), it has broad discretion to determine when sampling techniques are appropriate. *Id.* at 31–32. Commerce argues that its determination that the reported sample of such or similar merchandise is not representative of the class or kind of merchandise is a reasonable exercise of its discretion. *Id.* at 32–33.

■ This Court has already determined that 19 U.S.C. § 1677b does not require the exclusion of below-cost sales when determining the profit amount in calculating con-

structed value.[4] *Torrington,* 19 CIT at ——, 881 F.Supp. at 633. In order for below-cost sales to be excluded, it must be shown that the sales were made outside the ordinary course of trade.[5] *Id.* In *Torrington,* the Court noted that Commerce's determination of whether an importer's sales are in the ordinary course of trade is entitled to deference and that the plaintiff bears the burden of demonstrating the sales Commerce included in its FMV calculation were outside the ordinary course of trade. *Id.* The Court concluded that "[t]he statutory language and structure support Commerce's determination that below-cost sales are not automatically excluded from the calculation of profit in determining constructed value." *Id.* Thus, because Torrington has failed to present any evidence in this case that the below-cost sales at issue were outside the ordinary course of trade, this Court finds Commerce's inclusion of the below-cost sales in its calculation of profit for constructed value to be reasonable and in accordance with law.

Torrington's alternative argument is also without merit. In asserting that Commerce should have calculated constructed value based upon the reported sample sales of such or similar merchandise, Torrington misconstrues the meaning and purpose of 19 U.S.C. § 1677f–1 which states the following:

4. The relevant portions of 19 U.S.C. § 1677b governing the determination of FMV and the use of constructed value are as follows:

 (a) **Determination; fictitious market; sales agencies**
 For purposes of this subtitle—
 (1) **In general**
 The foreign market value of imported merchandise shall be the price, at the time such merchandise is first sold within the United States by the person for whom (or for whose account) the merchandise is imported to any other person ...
 (A) at which such or similar merchandise is sold or, in the absence of such sales, offered for sale in the principal markets of the country from which exported, in the usual commercial quantities and *in the ordinary course of trade* for home consumption....
 ....
 (e) **Constructed value**
 (1) **Determination**
 For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of—
 (A) the cost of materials ... and of fabrication or other processing of any kind employed

For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority *may*—

 (1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and

 (2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

**(b) Selection of samples and averages**

 *The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.*

(Emphasis added). The statute explicitly grants Commerce the authority to select the appropriate samples as long as the samples are "representative of the transactions under investigation." 19 U.S.C. § 1677f–1. In addition, the Court has consistently recognized that Commerce has been given broad discretion in its sample selection methodology.

 in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business;
 (B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—
 ....
 (ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost ...
 (Emphasis added).

5. The statute defines the term "ordinary course of trade" as "the conditions and practices which, for a reasonable time prior to the exportation of the merchandise which is the subject of an investigation, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1988).

*Nachi–Fujikoshi Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1106, 1109 (1995); *see also GMN Georg Muller Nurnberg AG v. United States,* 15 CIT 174, 179, 763 F.Supp. 607, 612 (1991); *Asociacion Colombiana de Exportadores de Flores v. United States,* 13 CIT 13, 20–22, 704 F.Supp. 1114, 1120–22 (1989), *aff'd,* 901 F.2d 1089 (Fed.Cir.), *cert. denied,* 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

 If Commerce has broad discretion in choosing a sample methodology, then Commerce should also have discretion to decide not to use samples. The purpose of 19 U.S.C. § 1677f–1 is to permit Commerce to use sampling methodologies when necessary due to the volume of sales involved. The legislative history clarifies the purpose of § 1677f–1 as being "to reduce the costs and administrative burden on the Department of Commerce of determining dumping margins...." H.R.Rep. No. 725, 98th Cong.2d Sess. 46 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4910, 5173. There is no support in either the statute or the legislative history for Torrington's claim that Commerce is required to use samples. In fact, Commerce's authority to use samples is limited by the requirement that the samples be representative of the transactions under investigation. *See* 19 U.S.C. § 1677f–1. As such, Commerce's decision not to rely on the samples for calculating constructed value based on its determination that the sample sales were not representative of the transactions under investigation, is reasonable and in accordance with law.

### 9. Calculation of Cash Deposit Rates

In this review, Commerce used two different methodologies to calculate assessment rates and cash deposit rates. To determine assessment rates for ESP sales, Commerce divided the total amount of potential uncollected dumping duties ("PUDD") for the reviewed sales by the total entered value of those sales. *Final Results,* 58 Fed.Reg. at 39,732. To calculate cash deposit rates, Commerce divided each exporter's PUDD by the total net USP for that exporter's sales under each dumping order during the period of review. Commerce then used weighted-averages to arrive at a single deposit rate for each class or kind of merchandise for each exporter included in the review. 58 Fed. Reg. at 39,731–32.

Although Torrington concedes that this Court has consistently upheld Commerce's methodology for calculating cash deposit rates, Torrington still insists that Commerce erred. *Torrington's Brief* at 79. Torrington contends that the statute requires the assessment rate to equal the cash deposit rate in order for Commerce to collect the correct amount of antidumping duties. *Torrington's Brief* at 79–88. Torrington also argues that Commerce's decision to use total USP instead of entered value data results in the undercollection of antidumping duties. *Id.* at 84–87.

Commerce responds that the statute does not specify the manner in which Commerce must calculate cash deposit rates. As such, Commerce contends that its methodology is a reasonable exercise of its discretion and that this Court should continue to sustain its practice. *Commerce's Brief II* at 43–46.

 The CAFC recently upheld Commerce's methodology for determining cash deposit rates. *Torrington,* 44 F.3d at 1578–79. Specifically, in upholding Commerce's methodology, the CAFC stated the following:

Section 1675(a)(2) does not require the same method of calculation for assessment rates and cash deposit rates. Nor does it specify a particular divisor when calculating either assessment rates or cash deposit rates. Rather, the statute merely requires that PUDD, the difference between foreign market value and United States price, serve as the basis for both assessed duties and cash deposits of estimated duties. ITA based its calculation of both rates on PUDD. Thus, ITA's use of different methods for calculating these rates does not conflict with the statute.[6]

6. 19 U.S.C. § 1675(a)(2) (1988) provides as follows:

For the purpose of [reviewing and determining the amount of any antidumping duty during a § 1675(a)(1) annual administrative review], the administering authority shall determine—

*Id.* at 1578. Furthermore, the CAFC held that "[n]o evidence compels [a finding] that deriving cash deposit rates from entered values leads to a more accurate estimation of future duties than reliance on total United States price." *Id.* at 1579. In light of the decision of the CAFC, the Court finds that Commerce's method for calculating cash deposit rates is in accordance with law.

### 10. *Pre–Sale Inland Freight Expenses*

In the review at issue, Commerce deducted pre-sale inland freight expenses from FMV. *Final Results,* 58 Fed.Reg. at 39,768. Torrington objects to this deduction claiming that it is inconsistent with the decision of the CAFC in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398 (Fed.Cir.1994), *reh'g, en banc, denied,* 1994 U.S.App. LEXIS 16258 (Fed.Cir. March 1, 1994), *and cert. denied,* —— U.S. ——, 115 S.Ct. 67, 130 L.Ed.2d 23 (1994). *Torrington's Brief* at 108–11. According to Torrington, the *Ad Hoc* decision applies to all FMV calculations, as opposed to only purchase price situations, and prohibits Commerce from deducting pre-sale movement expenses from FMV. *Torrington's Brief* at 109–10. Torrington requests a remand for Commerce to recalculate FMV without any deduction for pre-sale freight expenses. *Id.* at 111.

Commerce agrees with Torrington that a remand is necessary in light of the CAFC decision in *Ad Hoc* rejecting Commerce's practice of deducting pre-sale movement expenses from FMV. *Commerce's Brief II* at 58–59.

Defendant-intervenors disagree with Torrington and Commerce arguing that the decision in *Ad Hoc* is limited to purchase price situations. *See, e.g., SKF's Brief II* at 141–148.

■ In *Torrington Co. v. United States,* 68 F.3d 1347, 1352–56 (Fed.Cir.1995), the·

CAFC limited the application of *Ad Hoc* to situations in which USP is calculated based on purchase price as opposed to ESP. The Court specifically held that Commerce may deduct indirect selling expenses, including pre-sale transportation expenses, from FMV pursuant to the ESP offset permitted by 19 C.F.R. § 353.56(b)(2). *Id.; see also Torrington,* 19 CIT at ——, 881 F.Supp. at 638. Thus, Commerce may deduct pre-sale inland freight expenses from FMV when USP is calculated on the basis of ESP. As it is not clear to this Court whether FMV was calculated in this case using purchase price or ESP, the Court remands this issue to Commerce to deny the adjustment to FMV for pre-sale home market transportation expenses only where FMV was calculated using purchase price.

### 11. *Treatment of Resale Profit*

Torrington asserts that Commerce erred in refusing to deduct profit on resale transactions from ESP. Torrington urges the Court to depart from its prior decisions arguing that although the statute is silent on the issue, legislative history supports Torrington's contention that Commerce is required to deduct reseller profit in ESP calculations. *Torrington's Brief* at 113–15. Torrington further argues that Commerce's approach results in an artificial inflation of USP. *Id.* at 115–16.

In rebuttal, Commerce maintains that the Court should adhere to its prior decisions upholding Commerce's practice of not deducting reseller profit from ESP. *Commerce's Brief II* at 59–65.

■ The CAFC has affirmed this Court's decision holding that neither the statute nor the legislative history supports the position that Commerce is required to deduct resale profit from ESP. *Timken Co. v. United States,* 37 F.3d 1470, 1478 (Fed.Cir.1994).

(A) the foreign market value and United States price of each entry of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

The administering authority ... shall publish notice of the results of the determination of antidumping duties in the Federal Register, and that determination shall be the basis for the assessment of antidumping duties on entries of the merchandise included within the determination and for deposits of estimated duties.

Section 1677a(e) sets forth the adjustments to ESP as follows:

> For purposes of this section, the exporter's sales price shall also be adjusted by being reduced by the amount, if any, of—
>
> (1) *commissions* for selling in the United States the particular merchandise under consideration.

19 U.S.C. § 1677a(e)(1) (1988) (emphasis added). The CAFC found that the meaning of the word "commissions" as used in the statute and the legislative history does not include profits and, therefore, Commerce is not required to consider profits in calculating ESP. *Timken Co.*, 37 F.3d at 1478. Thus, the Court sustains Commerce on this issue.

12. *Home Market Rebates, Discounts and Billing Adjustments*

Torrington objects to Commerce's treatment of price adjustments which were not reported on a transaction- or product-specific basis as indirect expenses. Torrington contends that home market rebates, discounts and billing adjustments that are not linked to individual transactions should be rejected rather than treated as indirect expenses. *Torrington's Brief* at 118–29. Torrington submits that Commerce's approach eliminates the incentive for respondents to provide Commerce with actual sale-by-sale expense information. *Id.* at 126. Torrington cites a prior decision by this Court remanding this issue to Commerce "to develop a methodology which removes [post-sale price adjustments] and rebates paid on sales of out of scope merchandise from any adjustments made to FMV for [post-sale price adjustments] or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV." *Torrington*, 17 CIT at 218, 818 F.Supp. at 1579.

Torrington's objections pertain to Commerce's treatment of price adjustments reported by NSK, Koyo and SKF. *Id.* at 119–25. In the case of NSK, Torrington submits that it was improper for Commerce to permit adjustments for NSK's discounts without evidence that NSK reported the discounts on a product-specific basis. *Id.* at 119–20. Torrington asserts that even though NSK did not report transaction-specific post-sale price

adjustments, Commerce treated these adjustments as indirect expenses. *Id.* at 120–21. Torrington raises similar objections with respect to Commerce's treatment of Koyo's post-sale price adjustments which were reported based on customer-specific allocations rather than based on actual price adjustments made for each transaction. *Id.* at 121–22. In addition, Torrington notes that SKF's cash discounts were reported on neither a transaction- nor product-specific basis. *Id.* at 123–24. Finally, Torrington claims that Commerce should have eliminated, as pertaining to out-of-scope merchandise, SKF's billing adjustments, which were not tied to specific in-scope sales transactions. *Id.* at 124–45.

Commerce agrees that, in light of the Court's decision in *Torrington*, a remand is necessary so that Commerce may determine whether the adjustments at issue may be allocated without including rebates and adjustments paid upon out of scope merchandise or, if Commerce cannot make such an allocation, then to deny the adjustments. *Commerce's Brief II* at 65.

Defendant-intervenor NSK argues that Commerce properly allowed adjustments for NSK's discounts and rebates. NSK contends that Commerce confirmed at verification that the discounts and rebates reported by NSK were related to scope merchandise. *Memorandum of Points and Authorities in Opposition to Motions for Judgment on the Agency Record ("NSK's Brief II")* at 42–45.

Defendant-intervenor SKF asserts that Commerce's treatment of SKF's discounts and billing adjustments was proper. To support its argument, SKF submits that its cash discounts were calculated and reported based on specific transactions in which customers were entitled to discounts. *SKF's Brief II* at 162–67. SKF admits that it could not trace discount payments to specific transactions, but explains that it used customer-number-specific payment terms which were applied on a transaction-specific basis to calculate cash discounts for eligible transactions. Accordingly, SKF claims that the discounts were not allocated but, rather, directly correlated to the sales. *SKF's Brief II* at 163–64. SKF further claims that discounts on out-of-

scope merchandise do not influence or distort discounts granted on subject merchandise because the same cash discount rate applies to all of the invoiced merchandise. *Id.* at 165–66. SKF also argues that its billing adjustments were properly treated as indirect selling expenses. *Id.* at 167–71. Finally, SKF insists that it was lawful for Commerce to treat its post-sale price adjustments as indirect selling expenses where transaction-specific reporting was not feasible and the post-sale price adjustments were allocated in a reasonable manner. *Id.* at 171–76.

Defendant-intervenor Koyo urges the Court to reconsider its decision in *Torrington* and uphold Commerce's treatment of Koyo's post-sale price adjustments as indirect expenses. *Memorandum of Defendant–Intervenors Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. in Response to the Motions of The Torrington Company and Federal–Mogul Corporation for Judgment on the Agency Record* ("*Koyo's Brief*") at 63–67.

In the Final Results, Commerce explained its approach to claims for discounts, rebates and price adjustments as follows:

> As a general matter, the Department only accepts claims for discounts, rebates and price adjustments as direct adjustments to price if actual amounts are reported for each transaction. Thus, discounts, rebates, or price adjustments based on allocations are not allowable as direct adjustments to price. . . .

> Therefore, we have made direct adjustments for reported home market discounts, rebates, and price adjustments if (a) they were calculated on a transaction-specific basis and were not based on allocations, or (b) they were granted as a fixed and constant percentage of sales on all transactions for which they are reported. If these adjustments were not fixed and constant but were allocated on a customer-specific or product-specific basis, we treated them as indirect selling expenses. We did not accept discount or rebate amounts based on allocations unless the allocations calculate the actual amounts for each individual sale.

> . . . .

SKF's billing adjustments 2 are corrections in price due to billing errors, and we generally allow such corrections as direct adjustments to price. However, because SKF cannot attribute the adjustments to particular sales, SKF has allocated the adjustments over the entire invoice value, which may contain multiple sales. Because they are not reported on a transaction-specific basis and are allocated over groups of sales on a customer-specific basis, we have treated them as indirect selling expenses.

> . . . .

> . . . We have treated SKF–Germany's and SKF–Sweden's cash discounts as indirect selling expenses because they were allocated on a customer-specific basis and actual amounts were not reported on a transaction-specific basis.

> . . . .

> We only accept home market discounts as direct adjustments to price if actual discounts are reported for each sale. . . . Therefore, we have treated NSK's home market early payment discounts as indirect selling expenses.

> . . . .

> Because NSK's lump-sum rebates and post-sale price adjustments are reported on a product- and customer-specific basis, but not on a transaction specific basis, we have treated them as an indirect expense.

> . . . .

> . . . Koyo reported home market post-sale price adjustments based on customer-specific allocations and not based on the actual price adjustments made for each transaction. Therefore, we have treated Koyo's post-sale price adjustments as indirect selling expenses. . . .

> . . . .

> Koyo granted rebates as a fixed and constant percentage of home market price on all sales to specific customers. Because we have actual rebate information on the subject merchandise, the issue of whether rebates were also granted on non-scope merchandise is irrelevant. Therefore, we have accepted Koyo's rebates as a direct adjustment to home market price, in accor-

dance with our policy on discounts and rebates....

*Final Results,* 58 Fed.Reg. at 39,759–62.

In *Torrington,* 17 CIT at 218, 818 F.Supp. at 1578, the Court held that merchandise outside the scope of an antidumping order cannot be used to calculate antidumping duties. The Court explained its rationale as follows:

> While ... the ITA has a large amount of discretion in developing and accepting averaging and sampling techniques, this Court cannot allow the ITA to use a methodology which allows for the inclusion of [post-sale price adjustments] and rebates on out of scope merchandise in calculating adjustments to FMV and ultimately the dumping margins. Therefore, this Court remands this issue to the ITA to allow the ITA to develop a methodology which removes [post-sale price adjustments] and rebates paid on sales of out of scope merchandise from any adjustments made to FMV for [post-sale price adjustments] or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV.

*Id.* at 218, 818 F.Supp. at 1579.

■ The Court declines to reconsider its decision in *Torrington.* The Court has continued to adhere to that decision as being consistent with 19 U.S.C. § 1675(a)(2) and the decision of the CAFC in *Smith–Corona Group v. United States,* 713 F.2d 1568, 1580 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *See Torrington,* 19 CIT at ——, 881 F.Supp. at 640. In the review at issue, Commerce did not distinguish between in-scope and out-of-scope merchandise in the calculation of discounts and post-sale price adjustments. This practice is inconsistent with the Court's decision in *Torrington* and, thus, a remand is necessary for Commerce to reconsider its approach. If Commerce is unable to develop a methodology which removes post-sale price adjustments and rebates on out of scope merchandise from its calculations of FMV, then Commerce must deny the adjustments.

### 13. *Below–Cost Sales*

In the Final Results, Commerce disregarded below-cost sales if they occurred during three months of the period of review. 58 Fed.Reg. at 39,750–51. Torrington argues that this approach is inconsistent with the statute and the legislative history. *Torrington's Brief* at 130–32. Torrington submits that a determination of whether 10% or more of the sales were made at below the cost of production is sufficient to satisfy the requirements of 19 U.S.C. § 1677b(b) once Commerce has established a history of below-cost sales. *Id.* Torrington further asserts that the three-month test applied by Commerce disproportionately affected sample companies in violation of 19 U.S.C. § 1677f–1(b). *Id.* at 132–33.

Commerce responds that its three-month test to determine whether below-cost sales have been made over an extended period of time is consistent with 19 U.S.C. § 1677b(b) and legislative history. *Commerce's Brief II* at 65–68. Commerce also maintains that this Court rejected the argument that the 10% test is sufficient by itself in *Timken Co. v. United States,* 11 CIT 786, 807–08, 673 F.Supp. 495, 515 (1987). *Commerce's Brief II* at 68–69. According to Commerce, historical data does not obviate the need for the three-month test because Commerce may not irrebuttably presume that pricing practices are consistent throughout different proceedings. *Commerce's Brief II* at 69–70. Commerce insists that it has discretion in determining what constitutes an "extended period of time." *Id.* at 72–73 (citing *NTN Bearing Corp. of Am. v. United States,* 18 CIT at ——, ——, 858 F.Supp. 215, 221 (1994)).

Finally, Commerce also urges this Court to reject Torrington's argument concerning sample companies because Torrington failed to raise this argument during the administrative proceedings. *Commerce's Brief II* at 70–71. In the alternative, Commerce contends that Torrington has not produced any evidence that Commerce's approach disproportionately affects sample companies. *Id.* at 71–73.

Defendant-intervenors support Commerce's methodology as being consistent

with the statute. *See, e.g., Memorandum of Defendant–Intervenors FAG Kugelfischer Georg Schafer KGaA, FAG Italia S.p.A., FAG (U.K.) Limited, The Barden Corporation (U.K.) Limited, FAG Bearings Corporation and The Barden Corporation in Opposition to Plaintiff's Rule 56.2 Motion for Judgment Upon the Agency Record ("FAG's Brief II")* at 78–82.

Section 1677b(b), Title 19, United States Code, requires Commerce to disregard sales made at less than the cost of production in the determination of FMV if Commerce determines that the sales "have been made over an extended period of time and in substantial quantities," and "are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade." The Court has previously noted that Congress did not provide a specified time period in the statute for determining whether sales below cost were made over an extended period of time and, therefore, has left it up to Commerce to determine what constitutes an extended period of time within the context of a particular proceeding. *See NTN Bearing Corp. of Am. v. United States,* 19 CIT ——, ——, 881 F.Supp. 595, 602 (1995); *see also NTN Bearing Corp. of Am. v. United States,* 18 CIT ——, ——, 858 F.Supp. 215, 222 (1994). Accordingly, if Commerce's interpretation is reasonable, it must be sustained. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694.

In the Final Results, Commerce explained its reasons for applying the three-month test in this review:

> Section 773(b)(1) of the Tariff Act is designed to ensure that below-cost sales are not disregarded if these sales occurred over a short period of time or resulted from normal business practices, such as selling obsolete or end-of-year merchandise at below-cost prices. Below-cost sales in at least three months out of the review period is a reasonable indication that sales

> below COP [cost of production] are not random, accidental, or sporadic.

> Section 773(b)(1) does not direct that, once below-cost sales are found over an extended period of time in one segment of the proceeding, the Department should presume for the other segments of the proceeding that below cost sales are being made over an extended period of time. Since pricing practices may change, what occurred earlier may not be relevant in the current period. Calculations of antidumping duties for a specific review period must be based on the pricing activities that occur during that review period. It follows that each element of the Department's below-cost test must also be based on pricing activities from the period being reviewed.

58 Fed.Reg. at 39,751.

The Court has previously determined that three months does constitute "an extended period of time." *See NTN Bearing Corp.,* 19 CIT at ——, 881 F.Supp. at 602; *see also NTN Bearing Corp,* 18 CIT at ——, 858 F.Supp. at 222. Commerce is correct in its assertion that it should not have to rely on pricing activities that occurred during a period prior to the investigation at issue. In *Timken,* 11 CIT at 807, 673 F.Supp. at 515, the court found that the 10% test does not satisfy the "extended period of time" requirement of § 1677b(b) noting that "while it is true that the ITA reviewed a period of more than a year, the court cannot ascertain from the agency's determination whether the below-cost sales were made *over that period.*" (Emphasis added). Thus, the court was concerned about below-cost sales made during the period of review. Similarly, the three-month test as applied in the present case is a reasonable interpretation of the "extended period of time" requirement contained in 19 U.S.C. § 1677b(b). Commerce's decision to rely on the three-month test as opposed to pricing practices that occurred prior to the period of review at issue is supported by substantial evidence and in accordance with law.[7]

---

7. While the Court upholds Commerce's decision to use the three-month test in addition to the 10% test, the Court is not limiting Commerce's ability to apply a one or two month test. *See infra* at 420–21.

14. *Exclusion of Koyo's "Roller Chain" Sales*

■ In this review, Commerce accepted Koyo's weighted-average entered value data in determining which sales should be excluded pursuant to the "Roller Chain" rule.[8] Commerce explained its reasons for relying on Koyo's weighted-average entered value data in the Final Results:

> In this case, the products under review are fungible merchandise, and are often untraceable in the production process. Therefore, we realize that it is occasionally necessary to use estimates based on weighted averages. Koyo's use of weighted averages provided a reasonable measure of whether the imported scope merchandise was an insignificant percentage of the value of the finished product. Furthermore, since the imported merchandise could not be reliably linked to the specific finished products, Koyo's average experience is a reasonable indication of the significance of the imported merchandise in the finished product. Finally, there is no evidence on the record to indicate that the estimated resale prices submitted by Koyo are unreliable and should be rejected in favor of BIA [best information available].
>
> The Department has thus determined that Koyo reported relevant information as to its "Roller Chain" claim, and that the methods it used in the reporting were reasonable. This decision is consistent with *Allied-Signal Aerospace Company et al. v. United States et al.,* Slip Op. 93–1049 [996 F.2d 1185 (Fed.Cir.1993) ] (June 22, 1993), where the Court of Appeals held that the Department cannot resort to BIA "by ignoring alternative and simplified reporting methods to generate relevant information."

58 Fed.Reg. at 39,738.

Torrington contends that Commerce's reliance on Koyo's reported weighted-average entered values is inconsistent with legislative intent to subject further manufactured merchandise to antidumping duty findings. *Torrington's Brief* at 151–55 (referring to S.Rep.

No. 1298, 93d Cong., 2d Sess. 172–73 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310). Torrington further asserts that Commerce, in the Final Results, improperly relied on the CAFC decision in *Allied–Signal Aerospace Co. v. United States,* 996 F.2d 1185 (Fed.Cir. 1993), to support its decision to accept Koyo's data. *Torrington's Brief* at 155–57. According to Torrington, Commerce misapplied *Allied–Signal,* thereby creating "a loophole in the antidumping duty statute." *Id.* at 157. Torrington urges the Court to require Koyo to demonstrate that the results of the "Roller Chain" exclusion were not skewed due to the use of the weighted-average entered value data or, in the alternative, to require Commerce to apply a partial BIA rate. *Id.*

In support of its determination, Commerce points out that neither the statute nor the legislative history provides any guidance as to how "insignificant" should be measured for purposes of excluding merchandise comprising an insignificant amount of further manufactured products from the scope of review. Therefore, Commerce asserts that its interpretation of the statute is entitled to deference. *Commerce's Brief II* at 78–79.

Defendant-intervenor Koyo supports Commerce's position on this issue arguing that the weighted-average entered value data provided by Koyo constitutes the best information available. *Koyo's Brief* at 72–77. Koyo explains that to obtain the weighted average, Koyo multiplied the entered value for each of the three imported scope products by the quantity sold to the U.S. affiliate during the period of review, added the resulting amounts, and divided the result by the total quantity of the three scope merchandise sold. *Id.* at 74. Koyo claims that its calculations were straightforward and, therefore, did not skew the results. *Id.* at 74–75.

The issue presented by Torrington is not the validity of the "Roller Chain" rule itself but, rather, the use of weighted averages in determining whether the subject merchandise exceeds the one percent "Roller Chain" threshold. Section 1677a(e)(3), Title 19,

---

**8.** Imports of scope merchandise are not subject to antidumping duties if they comprise an insignificant amount of the sales value of the finished product sold to unrelated customers in the Unit-

ed States. *See Roller Chain, Other Than Bicycle, From Japan; Final Results of Administrative Review of Antidumping Finding,* 48 Fed.Reg. 51,-801, 51,804 (Nov. 14, 1983).

United States Code, instructs Commerce to reduce exporter's sales price by the amount of "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise after the importation of the merchandise and before its sale to a person who is not the exporter of the merchandise." The legislative history of this section clarifies that Congress intends for the antidumping law to cover further processed merchandise, but only if the manufactured or assembled products contain more than an insignificant amount of the imported merchandise. To this effect, the Senate Report states:

[I]mported merchandise for which an exporter's sales price calculation must be made will not escape the purview of the Act by virtue of its being further processed or manufactured subsequent to its importation but before its sale to the first purchaser in the United States unrelated to the foreign exporter.... The Committee does not intend this provision to apply, however, unless the product ultimately sold to an unrelated purchaser contains a significant amount by quantity or value of the imported product....

S.Rep. No. 1298, 93d Cong., 2d Sess. 172–73 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7310. *See also* H.R.Rep. No. 571, 93d Cong., 1st Sess. 70 (1973).

 Since neither the statute nor the legislative history suggests the manner in which Commerce is to determine what constitutes a "significant" amount, Commerce's reliance on Koyo's weighted-average data to determine whether the subject merchandise exceeded the one percent threshold does not contravene the intent of Congress. Torrington has not demonstrated that this data distorted the results in such a manner as to result in further manufactured products containing a significant amount of scope merchandise being excluded from review. Considering that the merchandise at issue could not be specifically traced in the production process, the data reported by Koyo were the best alternative to actual entered values. Further, Koyo's methodology for calculating the weighted-averages was reasonable. Ac-

cordingly, the Court sustains Commerce's determination on this issue.

15. *NTN's Selling Expenses*

Torrington claims that Commerce erred in accepting NTN's United States selling expenses on the basis of transfer prices to related parties. *Torrington's Brief* at 158–59. Torrington argues that Commerce should reallocate expenses on the basis of prices to unrelated customers rather than permit NTN to influence the amount of adjustments by controlling the setting of transfer prices. *Id.* at 158. Torrington also asserts that it provided information concerning the unreliability of NTN's transfer prices while Commerce failed to document its review of NTN's transfer prices in the administrative record. *Id.* at 158–59.

Commerce responds that in verifying NTN's transfer prices, it found no discrepancies or evidence of price manipulation. *Commerce's Brief II* at 80. Commerce further alleges that it randomly tested NTN's transfer prices and did not find any reason to suspect price manipulation. *Id.* at 80–81.

Defendant-intervenor NTN supports Commerce's position arguing that the Court should not consider the evidence presented by Torrington concerning NTN's transfer prices because Torrington did not refer to this evidence in its principal administrative brief. *Defendant–Intervenors NTN Bearing Corporation of America, American NTN Bearing Manufacturers and NTN Corporation's Response to Plaintiff's, The Torrington Company Rule 56.2 Judgment on the Agency Record and Plaintiff–Intervenor's Federal–Mogul Corporation Memorandum in Support Thereof ("NTN's Brief II")* at 47–49. In the alternative, NTN submits that there is no evidence that the sample list of transfer prices provided by Torrington is representative of NTN's pricing. *Id.* at 46.

Pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988) and 19 C.F.R. § 353.56, Commerce makes adjustments for differences in circumstances of sale. In the present review, for the purpose of calculating circumstance of sale adjustments, Commerce accepted NTN's allocation of selling expenses on the basis of transfer prices. *Final Results,* 58 Fed.Reg.

at 39,741. Commerce explained its reasons for relying upon NTN's transfer prices for the purpose of computing circumstance of sale adjustments as follows:

> Although we agree that there is the potential for the misallocation of expenses if transfer prices are unreasonable, our examination of information on the record gives us no reason to believe that NTN's transfer prices are misstated. To test this, we randomly compared transfer prices for several products with the corresponding COPs of these products and found that transfer prices either equaled or exceeded the COPs. For this reason, and because Torrington provided no evidence that NTN's transfer prices are unreasonable, we have accepted NTN's allocation methodology.

*Id.*

■■ Torrington's evidence concerning the reliability of NTN's transfer prices is insufficient to demonstrate the existence of price manipulation by NTN. Torrington presented Commerce with a random sampling of transfer prices without demonstrating that the examples chosen were actually representative of NTN's transfer pricing. *See Pre-Preliminary Determination Comments of the Torrington Company Regarding NTN Corporation (Japan),* C.R. Document No. 163, Fiche 322, Frame 59. NTN responded to Torrington's allegations and explained the reason for the existence of the transfer prices cited by Torrington. *See* Letter from Law Firm of Barnes, Richardson & Colburn to Hon. Ronald H. Brown dated April 5, 1993, C.R. Document No. 167, Fiche 324, Frame 55. Furthermore, while transfer prices can be considered suspect, Commerce conducted a test comparing random transfer prices with corresponding cost of production data to ensure the reliability of the transfer prices reported by NTN. *See Final Results,* 58 Fed.Reg. at 39,741. Thus, in light of both the absence of evidence demonstrating price manipulation by NTN, and the measures taken by Commerce to test the reliability of the reported prices, the Court finds that Commerce's actions are supported by substantial evidence on the agency record.

### 16. *Adjustment to NTN's United States Price*

Torrington objects to Commerce's acceptance of NTN's downward adjustments to United States indirect selling expenses for interest paid on cash deposits. *Torrington's Brief* at 160–61. According to Torrington, such expenses are not subject to verification and are hypothetical in nature because NTN may receive refunds with interest to compensate for any over-deposits of antidumping duties. *Id.* at 161 (referring to 19 U.S.C. § 1677g (1988)).

Commerce agrees that a remand is necessary to permit Commerce to reconsider its approach. *Commerce's Brief II* at 81–82.

Defendant-intervenor NTN supports Commerce's actions in the Final Results, claiming that the refund of over-deposits with interest does not adequately compensate NTN for its selling expenses. *NTN's Brief II* at 50. NTN further argues that this Court's decision in *Federal–Mogul Corp. v. United States,* 17 CIT 88, 108, 813 F.Supp. 856, 872 (1993), holding that Commerce is not required to deduct cash deposits from USP, supports its position.

■■ In the Final Results, Commerce stated the following with respect to NTN's interest expenses:

> We do not consider cash deposits of estimated antidumping duties to be direct selling expenses. Therefore, we also do not consider interest paid on such deposits to constitute a direct selling expense. Accordingly, we have accepted, in principle, NTN's offset to interest expenses for interest paid on cash deposits.

58 Fed.Reg. at 39,749. The Court finds that a remand is necessary for Commerce to reconsider its approach on this issue. Commerce does not provide any reasons for its decision to treat cash deposits and the interest paid on such deposits in the same manner. Further, in *Federal–Mogul,* 17 CIT at 108, 813 F.Supp. at 872, the Court held that "the ITA was correct to deduct from USP only deposits of the actual normal import duties owed which can be accurately determined, and the ITA was correct not to deduct cash deposits of estimated antidumping

duties, which may not bear any relationship to the actual dumping duties owed, from USP." The decision in *Federal–Mogul* did not address the issue of interest paid on cash deposits and, therefore, this Court declines to extend the holding in *Federal–Mogul* in the manner suggested by NTN. Thus, the Court remands this issue to Commerce to determine whether a downward adjustment to United States indirect selling expenses for interest paid on cash deposits is proper.

## 17. *NTN's Liaison Expenses*

NTN maintained a liaison office in the U.S. to facilitate sales to an unrelated party. Torrington contends that Commerce improperly excluded NTN's liaison expenses from U.S. indirect selling expenses. *Torrington's Brief* at 162–63. According to Torrington, the expenses should have been deducted from purchase price sales pursuant to 19 U.S.C. § 1677a(d)(2)(A) (1988). In the alternative, Torrington asserts that the liaison expenses should be treated as commissions and deducted from purchase price even though these expenses were paid to a related party. According to Torrington, the CAFC decision in *LMI–La Metalli,* 912 F.2d at 459, supports Torrington's position that commissions paid to related parties are not *per se* unreliable. *Torrington's Brief* at 163.

Commerce responds that 19 U.S.C. § 1677a(d)(2)(A) applies only to movement expenses which typically include U.S. inland freight and insurance expenses, U.S. brokerage, handling and port charges, U.S. customs duties, international freight expenses, foreign inland freight and insurance expenses, and foreign brokerage, handling and port charges. *Commerce's Brief II* at 83. Commerce insists that expenses associated with maintaining a liaison office in the U.S. to facilitate communication with an unrelated U.S. buyer cannot be characterized as movement expenses. *Id.* at 84. Commerce also rejects Torrington's classification of these expenses as commissions arguing that there is no evidence that the expenses were incurred based on a percentage of the liaison sales or on the profit to NTN. *Id.* at 84–85. Commerce concludes that *LMI–La Metalli* is not applicable because the expenses at issue are not commissions. *Id.* at 85–86.

Defendant-intervenor NTN supports Commerce's position on this issue. *NTN's Brief II* at 51–52.

█ Section 1677a(d)(2)(A) instructs Commerce to reduce purchase price by "the amount, if any, included in such price, attributable to any additional costs, charges, and expenses, and United States import duties, incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." The Court agrees with Commerce that the liaison expenses at issue are not covered by this provision. The record indicates that the expenses were associated with shipping the merchandise to the unrelated company's warehouse in Japan. *See Verification Report,* C.R. Document No. 162, Fiche 322, Frame 19. Thus, the expenses incurred cannot be classified as movement expenses because they were not incident to bringing the merchandise into the United States.

The next issue is whether these payments constitute related-party commissions requiring a circumstance of sale adjustment pursuant to 19 U.S.C. § 1677b(a)(4)(B). Commerce's regulations provide the following guidelines for adjustments due to differences in circumstances of sales:

(a) *In general.* (1) In calculating foreign market value, the Secretary will make a reasonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a direct relationship to the sales compared.

(2) Differences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in commissions . . . .

19 C.F.R. § 353.56.

█ The record is unclear as to whether the liaison expenses are actually commissions, but the Court need not determine this issue because even if such expenses are commissions, a circumstance of sale adjustment

is not warranted. In *LMI–La Metalli*, the CAFC permitted a circumstance of sale adjustment where LMI–La Metalli Industriale, S.p.A. ("LMI") provided evidence that commissions paid to a subsidiary of LMI, Pontinox, were at arm's length and directly related to the sales under review. 912 F.2d at 460. In that case, LMI presented data comparing its agency relationships in other countries to the commissions paid to the subsidiary. Based on this evidence, the court concluded that the subsidiary was a *bona fide* agent of LMI. *Id.* Contrary to Torrington's assertions, *LMI–La Metalli* does not impose a duty on Commerce to investigate such transactions to determine whether they are arms length. The decision in *LMI–La Metalli* focuses on Commerce's duty not to ignore evidence on the record. Specifically, in reference to commission payments to related parties, the court noted that "[m]anipulation may be possible, but speculation as to its existence must yield to evidence. When all of the circumstances are considered, we conclude that Pontinox was, *on the record before us,* the *bona fide* agent of LMI." 912 F.2d at 460 (emphasis added) (citations omitted). On the record before this Court, there is no evidence that the commissions were based on arms-length transactions. Accordingly, the Court sustains Commerce on this issue.

18. *Treatment of NTN's Aftermarket Sales*

In the Final Results, Commerce recognized three distinct commercial levels of trade for NTN: original equipment manufacturers ("OEMs"), distributors and aftermarket customers. 58 Fed.Reg. at 39,767. Torrington argues that sales to aftermarket customers and distributors should have been collapsed to form a single level of trade. *Torrington's Brief* at 165–71. According to Torrington, the evidence on the record, *i.e.,* differences in price without an analysis of selling expenses, is not enough to support a finding of separate levels of trade. *Id.* at 167. Torrington further alleges that Commerce's treatment of NTN on this issue is inconsistent with its treatment of NSK. *Id.* at 167–68. Finally, Torrington claims that Commerce's classification of aftermarket sales resulted in a comparison of merchandise from different levels of trade that violated both 19 U.S.C. § 1677(16) and 19 C.F.R. § 353.58 (1993). *Torrington's Brief* at 169–70.

In the Final Results, Commerce stated the following regarding its level-of-trade classifications:

> We initially base our level-of-trade classifications on the function of the class of customer reported by respondents. Those classifications may be rebutted by such factors as differences in prices and selling expenses that discredit a respondent's distinctions. See Import Administration Policy Bulletin 92/1, July 29, 1992. Because our preliminary level of trade analysis did not focus on the function of the customer category, we concur with NTN that we improperly combined distributor and aftermarket sales. Further, we note that Torrington failed to provide any evidence to rebut NTN's claim that aftermarket sales constituted a distinct level of trade. Because we have no information to suggest that NTN's aftermarket customers perform the same function as either original equipment manufacturers or distributors, or that the prices and selling expenses for sales to aftermarket customers do not differ from those to other customer categories, we conclude that NTN's sales to aftermarket customers constitute a distinct level of trade. Therefore, we have compared aftermarket sales in the United States first to aftermarket sales of such or similar merchandise in the home market.

58 Fed.Reg. at 39,767.

Commerce explains that pursuant to its "functional test," it presumes that net prices and selling expenses are different at each level of trade. According to Commerce, Torrington failed to overcome this rebuttable presumption. *Commerce's Brief II* at 87–89. Commerce also distinguishes its treatment of NTN from that of NSK, explaining that NSK provided information based on an end-use analysis rather than on a functional analysis. *Id.* at 89. Finally, Commerce claims that its method of comparing identical merchandise at the same level of trade and then matching identical merchandise at the next most com-

parable level of trade is consistent with both 19 U.S.C. § 1677(16) and 19 C.F.R. § 353.58. *Id.* at 90–93.

Defendant-intervenor NTN supports Commerce's position on this issue. *NTN's Brief II* at 52–56.

■■■ Commerce's regulations instruct it to "calculate foreign market value and United States price based on sales at the same commercial level of trade." 19 C.F.R. § 353.58. To effectuate this regulation, Commerce's methodology for determining levels of trade is as follows:

> In asking for LOT [level of trade] information, the Department is trying to determine where in the distribution chain the respondent's customer falls (end user, distributer, retailer). *The presumption is that the net price and/or selling expenses and, therefore, the foreign market value (FMV) are different at each LOT.* Therefore, it appears reasonable to match at LOT if the different customer categories have different functions. In other words, if the respondent reports LOT with distinct, discernible functions, the Department will, when possible, make matches at the same level of trade, unless there is evidence to rebut the assumption that FMV is affected by LOT.
>
> The next question is, how can parties rebut the underlying assumption? In the past the Department has articulated a price correlation test and has been upheld in the courts. *Upon further consideration we find that the test should encompass both prices and selling expenses, because selling expenses also affect the foreign market value.* Therefore, only if a contesting party has shown that there is not a significant correlation between prices and selling expenses on the one hand, and levels of trade on the other, will we disregard the level of trade when making sales comparisons in cases where different functional levels of trade exist.

*Import Administration Policy Bulletin 92/1,* July 29, 1992 ("*Policy Bulletin*") (emphasis added). In the Policy Bulletin, Commerce clearly states that in order for a respondent to rebut a level of trade classification, the respondent must present evidence concerning both prices and selling expenses. In spite of Commerce's citation to this Policy Bulletin in the Final Results, in actuality, Commerce failed to apply the analysis stated therein. Commerce erred by focusing on Torrington's failure to show that "prices and selling expenses for sales to aftermarket customers do not differ from those to other customer categories." 58 Fed.Reg. at 39,767. Before considering whether Torrington satisfied its burden, Commerce should have determined whether NTN demonstrated that with respect to aftermarket customers, distributors and OEMs, prices *and selling expenses do* differ. While there is evidence supporting a finding that prices varied among sales to aftermarket customers, distributors and OEMs, the Court has not found any evidence on the record concerning selling expenses. *See Verification Report,* C.R. Document No. 162, Fiche 322, Frames 16–17. Accordingly, this issue is remanded to Commerce to determine whether NTN satisfied its burden by demonstrating that selling expenses for aftermarket customers were different than for distributors and OEMs and, if not, to collapse aftermarket and distributor sales to form a single level of trade.

### 19. *Home Market Viability*

Torrington alleges that Commerce failed to achieve a fair or accurate comparison between sales in the U.S. and sales in the foreign market by calculating home market viability for NMB/Pelmec Singapore and NMB/Pelmec Thailand based on quantity alone. Because of the differences in diameters of the bearings under review, Torrington contends that Commerce should have determined viability based on weight rather than quantity. Torrington also asserts that Commerce should have conducted its viability test on the basis of such or similar merchandise, rather than by class or kind of merchandise. *Torrington's Brief* at 172–75, 187–91.

Commerce responds that it determined that the number of bearings sold was usually the best measure of the viability of the home market and, therefore, required NMB/Pelmec to report its sales upon this basis. *Commerce's Brief II* at 95. In the Final Results, Commerce stated:

Torrington has provided no evidence that weight is a better indicator of commercial activity in a particular market than sales quantity. Further, NMB/Pelmec Thai and NMB/Pelmec Singapore did not report data on bearing weight because, in accordance with the instructions contained in our original and supplemental questionnaires, they were able to determine that the home market was viable on the basis of sales quantities. Because NMB/Pelmec Thai and NMB/Pelmec Singapore complied fully with our instructions, and because we find no basis for believing that bearing weight provides a better indication of market activity than sales quantity, we have accepted the viability data that respondents reported in these reviews.

58 Fed.Reg. at 39,784. NMB/Pelmec supports Commerce's position on this issue. *Brief of NMB/Pelmec in Opposition to The Torrington Company's and Federal Mogul Corporation's Motions for Judgment Upon the Administrative Record ("NMB/Pelmec's Brief")* at 22–27.

■ In *Torrington*, 19 CIT at ——, 881 F.Supp. at 646, the Court upheld Commerce's methodology. The Court noted that the statute "provides general guidance and leaves the application of a particular methodology to the administering authority." *Id.* The Court concluded that Commerce's use of quantity as a measure of home market viability was a reasonable means of measuring the viability of the home markets. *Id.* The Court adheres to its prior decision and sustains Commerce on this issue.

20. *NMB/Pelmec's "Route B," Bonded Warehouse and Dollar Denominated Sales*

A. *"Route B" Sales*

Torrington contends that Commerce should have excluded NMB/Pelmec's "Route B" sales to Thailand from its home market database. *Torrington's Brief* at 177–80. Torrington argues that Commerce's treatment of NMB/Pelmec's "Route B" sales is inconsistent with Commerce's actions in the original investigation in which Commerce determined that the "Route B" sales were third country sales because of the unusual circum-

stances surrounding the sales. *Id.* at 177–78. Torrington further alleges that Commerce should have excluded the "Route B" sales from the home market database because the sales were not made in the ordinary course of trade. *Id.* at 183–84. In the alternative, Torrington asserts that Commerce should have rejected all adjustments for pre-sale movement expenses associated with "Route B" sales. *Id.* at 185.

Commerce responds that in comparing prices in the United States and in the home market, the antidumping statute provides that FMV must be based upon sales in the home market which are in the ordinary course of trade. *Commerce's Brief II* at 103 (citing 19 U.S.C. § 1677b(a)(1)). Commerce asserts that in the original investigation it did not treat the "Route B" sales as home market sales because the first sale to an unrelated party took place in Singapore, a third country. *Commerce's Brief II* at 105. Commerce contrasts this with the instant review and the two prior reviews in which Commerce treated the "Route B" sales as home market sales because even though the sales were exported to Singapore prior to delivery to customers in Thailand, the first sale to an unrelated party occurred in Thailand. *Id.* at 105–06.

Commerce further states that the statute and applicable regulation instruct Commerce to consider the conditions and practices which, for a reasonable period prior to the time of exportation of subject merchandise, have been normal in the trade of merchandise of the same class or kind in the home market country. *Commerce's Brief II* at 107 (citing 19 U.S.C. § 1677(15) (1988); 19 C.F.R. § 353.46(b) (1993)). Because NMB/Pelmec Thailand is subject to government restrictions upon the amount of merchandise it may ship directly to customers in Thailand, it has devised a method to circumvent those restrictions in order to increase its sales in the home market. Commerce argues it is perfectly logical, therefore, to recognize that the circumstances surrounding "Route A" and "Route B" sales will differ and to include "Route B" sales in the home market database. *Commerce's Brief II* at 107.

However, Commerce agrees with Torrington, that a remand is necessary to treat home market movement expenses associated with "Route B" sales in a manner consistent with *Ad Hoc,* 13 F.3d at 398. *Commerce's Brief II* at 107–08.

Defendant-intervenor NMB/Pelmec asserts that it ships Thai-manufactured bearings to unrelated customers in the Thai home market via two routes. "Route A" merchandise is shipped within Thailand to unrelated customers. "Route B" merchandise is exported from Thailand and shipped to NMB/Pelmec's Singapore selling affiliate before being returned to Thailand for delivery to the unrelated customer. "Route B" shipments are made to comply with Thai governmental programs which exempt material inputs of merchandise manufactured in Thailand for exportation from certain import duties and taxes. NMB/Pelmec argues that under these programs only a small quantity of the finished merchandise can be shipped directly in Thailand (that is, via Route A). Since NMB/Pelmec's home market sales of bearings exceed this quantity, most bearings NMB/Pelmec sells to unrelated customers in Thailand are exported from Thailand to Singapore and then imported into Thailand. NMB/Pelmec argues that such exportation to comply with benefit programs is indeed "in the ordinary course of trade" in Thailand. *NMB/Pelmec's Brief* at 27–32.

NMB/Pelmec opposes a remand to reconsider Commerce's treatment of "Route B" freight expenses arguing that *Ad Hoc* is limited to the calculation of FMV based on purchase price. *Id.* at 32.

In the original investigation, Commerce stated:

With respect to the sales to Singapore that were reimported into Thailand, we found at verification that NMB/Pelmec Thai had knowledge that these sales were ultimately destined for delivery and consumption in Thailand. However, knowledge is only one factor that we considered in determining whether these sales are appropriately home market or third country sales. We also considered the other, unusual circumstances surrounding these transactions. For example, because these

sales were exempt from certain taxes and import duties associated with other home market sales, the prices of these sales were not typical home market prices. In addition, the goods are physically exported from Thailand, and the first sale to an unrelated party takes place in Singapore. Lastly, these sales earn export subsidies and are considered exports by the Government of Thailand for purposes of maintaining export statistics. All of these factors combined outweigh the importance of knowledge of the final destination in the determination of whether these sales are properly considered home market or third country sales. Therefore, *we have determined that these sales are appropriately considered third country sales.*

*Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed.Reg. 19,117, 19,-118–19 (May 3, 1989) (emphasis added).

In the Final Results of this review, Commerce stated:

In previous reviews, we have accepted bonded warehouse sales to unrelated parties and "route B" sales in which the first unrelated purchaser is located in Thailand as home market sales. NMB/Pelmec Thai has reported its bonded warehouse and "route B" sales in the same manner as in previous reviews, and Torrington has provided no evidence to distinguish the sales at issue in this review from those that we accepted as home market sales in previous reviews. As a result, we have treated NMB/Pelmec Thai's bonded warehouse and "route B" sales as home market sales for these final results.

58 Fed.Reg. at 39,782–83.

In *Torrington,* 19 CIT at ——, 881 F.Supp. at 648, this Court found that Commerce's decision to accept "Route B" sales as home market sales during the second administrative reviews to be inconsistent with Commerce's decision in the original investigation. The Court remanded the issue to Commerce to provide an explanation for its change in findings or, if no reasonable explanation could be given, to exclude the "Route B" sales from the home market database.

*Id.* Although government counsel in this case argues that "Route A" and "Route B" sales are different, Commerce failed to explain on the record why Commerce arrived at a different conclusion in this case than it did in the original investigation where Commerce determined that "Route B" sales were appropriately considered third country sales. Accordingly, the Court remands this case to Commerce to explain why it changed its findings. If no reasonable explanation can be given, Commerce is to exclude "Route B" sales from the home market database.

On remand, Commerce is to deny the adjustment to FMV for movement expenses associated with the "Route B" sales only where FMV was calculated using purchase price. *See supra* at 404–405.

### B. *Bonded Warehouse-to-Bonded Warehouse Sales*

Torrington claims that by accepting sales from NMB/Pelmec's bonded warehouse to customers' bonded warehouse ("bonded warehouse sales") as the basis for foreign market value, Commerce disregarded agency precedent, statutory and regulatory requirements because (1) it ignored the unusual circumstances surrounding bonded warehouse sales, indicating that the sales were not in the "ordinary course of trade," and (2) it ignored the fact that bonded warehouse sales were not destined for "home consumption." *Torrington's Brief* at 180–84 (citing 19 U.S.C. § 1677b(a)(1); 19 C.F.R. § 353.46). Torrington asserts both Commerce, in the original investigation, and NMB/Pelmec in the review at issue, recognized the unusual circumstances of these sales. Torrington cites to the original investigation wherein Commerce determined that bonded warehouse sales were considered third country sales because of the unusual circumstances surrounding them. *Torrington's Brief* at 180.

Commerce states that, although Commerce treated bonded warehouse sales in the original investigation as third country sales, Commerce accepted these sales in this and the previous administrative review as home market sales because they were made to an unrelated customer, whereas the bonded warehouse sales in the original investigation were made to a related party. *Commerce's Brief II* at 108. Commerce explains that it did not treat NMB/Pelmec's bonded warehouse sales as home market sales in the original investigation because they were third country sales, not because Commerce found that these sales were outside the ordinary course of trade. *Id.* at 110–11. Commerce argues that the only evidence offered by Torrington, *i.e.*, its allegation that NMB/Pelmec made these sales to avoid home market sales quantity restrictions, fails to demonstrate that NMB/Pelmec's bonded warehouse sales were not made within the ordinary course of trade. *Commerce's Brief II* at 110. Commerce further asserts that it properly determined that NMB/Pelmec Thailand's bonded warehouse sales were sales for home consumption because Commerce had no probative evidence that the merchandise placed in NMB/Pelmec's bonded warehouse was subsequently exported. *Id.* at 111–12.

NMB/Pelmec, defendant-intervenor, argues that its bonded warehouse sales meet all of the requirements of 19 U.S.C. § 1677b(a)(1) in that they were sold "in the principal markets of the country from which exported, in the usual commercial quantities and in the ordinary course of trade for home consumption." *NMB/Pelmec's Brief* at 33.

In the original investigation, Commerce stated:

A large percentage of NMB/Pelmec Thai's home market sales of ball bearings are made from its own bonded warehouse to the bonded warehouse of a related original equipment manufacturer (OEM) in Thailand. Bonded warehouses in Thailand are by their very nature for exportation and, as such, bonded warehouse sales between related parties cannot be considered domestic sales.

*Final Determination of Sales at Less Than Fair Value: Ball Bearings and Parts Thereof From Thailand,* 54 Fed.Reg. at 19,119. As indicated above, Commerce determined in the original investigation that sales from NMB/Pelmec Thailand's bonded warehouse to the bonded warehouse of a related entity should be considered third country sales. *Id.* In contrast, the sales at issue in the current

review are sales to an unrelated customer in Thailand. *Final Results*, 58 Fed.Reg. at 39,-782–83.

■ In *Torrington*, 19 CIT at ——, 881 F.Supp. at 649–50, the Court upheld Commerce's treatment of NMB/Pelmec's bonded warehouse sales in the second administrative review. In response to Torrington's arguments, which were identical to the ones in the case at bar, the Court stated the following:

> Commerce having set forth adequate reasons for its decision to accept NMB's bonded warehouse sales as being made in the ordinary course of trade and for home consumption, and Torrington having failed in its burden to prove otherwise, this Court finds that Commerce's decision that NMB's bonded warehouse sales were made in the ordinary course of trade and for home consumption and its treatment of NMB's bonded warehouse-to-warehouse sales as home market sales is supported by substantial evidence contained in the administrative record and is in accordance with law.

*Id.* Similarly, Torrington has failed to present evidence supporting its position in this case, therefore, the Court sustains Commerce on this issue.

### C. Dollar–Denominated Sales

Torrington also objects to Commerce's decision to treat U.S. dollar-denominated sales as home market sales. Torrington argues that Commerce should have presumed that the dollar-denominated sales reported by NMB/Pelmec Thailand were destined for the United States and excluded them from the home market. *Torrington's Brief* at 185–86.

In rebuttal, Commerce explains that it requires respondents to provide prices and expenses in the currency in which the transactions occurred. *Commerce's Brief II* at 112. Accordingly, Commerce states that NMB/Pelmec Thailand properly reported U.S. dollar-denominated sales as such, and Commerce treated these sales as home market sales because there was no evidence that NMB/Pelmec Thailand knew, or had reason to know, the ultimate destination was other than the home market. *Id.* at 113. Defen-

dant-intervenor NMB/Pelmec agrees with Commerce's determination on this issue. *NMB/Pelmec's Brief* at 34–35.

In the Final Results, Commerce explained its reason for treating NMB/Pelmec's U.S. dollar-denominated sales as home market sales as follows:

> We would find [U.S. dollar-denominated sales] not to be home market sales only if the manufacturer was informed in advance, or had reason to know, of the ultimate destination of the merchandise, such as a result of special markings, market-specific specifications, or shipping instructions. In this review, there is no evidence in the record to suggest that NMB/Pelmec Thai had reason to know that U.S. dollar-denominated sales or sales to Thai affiliates of U.S. companies consisted of merchandise destined for the United States. Therefore, we have treated such sales as home market sales for these final results.

58 Fed.Reg. at 39,783.

■ Torrington bears the burden of proving whether the U.S. dollar-denominated sales were outside the ordinary course of trade and not for home consumption. *See Torrington*, 19 CIT at ——, 881 F.Supp. at 649; *see also Nachi–Fujikoshi Corp. v. United States*, 16 CIT 606, 608, 798 F.Supp. 716, 718 (1992). The only evidence Torrington offers to support its position is that NMB/Pelmec received U.S. dollars for the sale. This is insufficient to prove that these sales were not for home consumption. The fact that the currency used for a transaction between NMB/Pelmec and Thai affiliates for U.S. companies is U.S. dollars does not necessarily mean the ultimate destination for the merchandise is the United States. Commerce, in the Final Results, adequately explained the evidence it looks for in determining whether sales are outside the ordinary course of trade and not for home consumption. *See Final Results*, 58 Fed.Reg. at 39,-783. As Torrington has failed to produce this evidence, the Court finds that Commerce's treatment of NMB/Pelmec's dollar-denominated sales as home market sales is supported by substantial evidence on the administrative record and in accordance with law.

#### 21. Calculation of NMB/Pelmec's Profit

█ Torrington argues that Commerce erred by failing to exclude NMB/Pelmec's sales to related parties that were not found to have been made at arm's-length prices in calculating statutory profit for constructed value. *Torrington's Brief* at 192–95. According to Torrington, Commerce's actions conflict with the statute, regulations and prior practice. *Id.* (citing 19 U.S.C. § 1677b(a); 19 C.F.R. § 353.45 (1993); *Final Determinations of Sales at Less Than Fair Value: Certain Hot–Rolled Carbon Steel Flat Products, Certain Cold–Rolled Carbon Steel Flat Products, Certain Corrosion–Resistant Carbon Steel Flat Products, and Certain Cut-to-Length Carbon Steel Plate From Korea,* 58 Fed.Reg. 37,176 (1993)).

Commerce agrees that it improperly included NMB/Pelmec Thailand's sales to related parties in the calculation of profit for constructed value and requests a remand to correct its error. *Commerce's Brief II* at 113–14.

NMB/Pelmec, defendant-intervenor, argues that Commerce's actions were proper because there is no statutory requirement that Commerce exclude data on related-party sales in the constructed value profit calculation. *NMB/Pelmec's Brief* at 37–38.

Transactions between related parties are governed by 19 C.F.R. § 353.45 which states that "the Secretary ordinarily will calculate foreign market value based on [a related party sale] only if satisfied that the price is comparable to the price at which the producer or reseller sold such or similar merchandise to a person not related to the seller." Thus, before Commerce may use related party sales to calculate FMV, it must determine whether the selling prices reflect market prices. Commerce acknowledges that it failed to address this issue in the Final Results even though Torrington raised it during the administrative proceedings. *Commerce's Brief II* at 114; *see also Final Results,* 58 Fed.Reg. at 39,753. As such, the Court agrees that a remand is necessary for Commerce to determine whether the prices for the related-party sales were market prices. If the prices do not reflect market prices, Commerce must exclude such sales from its calculation of profit.

#### 22. Clerical Errors

█ Torrington alleges that Commerce made clerical errors in its Final Results with respect to NTN, Nachi–Fujikoshi Corporation, SKF–Germany, FAG–Germany, INA–Germany, FAG–Italy, SKF–Sweden, SKF–France, RHP–United Kingdom, and FAG–United Kingdom. *Torrington's Brief* at 134–148.[9] Commerce agrees that a remand is necessary to correct all of these errors. *Commerce's Brief II* at 73.

Defendant-intervenors, NTN, INA, FAG and RHP, disagree with Torrington and Commerce regarding several of the clerical errors. *See NTN's Brief II* at 45; *Response of Defendant–Intervenors INA Walzlager Schaeffler KG and INA Bearing Company, Inc. to the Motions of Plaintiff The Torrington Company and Plaintiff–Intervenor Federal–Mogul Corporation for Judgment Upon the Administrative Record* at 19–20; *FAG's Brief II* at 83–84; *Opposition of Defendant–Intervenors RHP Bearings and RHP Bearings Inc. to Plaintiff's and Plaintiff–Intervenor's Motion for Judgment on the Agency Record* at 28–29. The central issue raised by the defendant-intervenors concerns Commerce's decision to exclude below-cost sales made in one or two months during the period of review. Due to a clerical error, Commerce failed to achieve this result in the final determination. Defendant-intervenors contend that this is not an error, but rather a change in Commerce's policy to only exclude sales that were made during at least three months of the period of review. *See, e.g., FAG's Brief II* at 83–84. The Court has recently upheld Commerce's decision during the administrative review at issue to exclude below-cost sales that were made in one or two months during the period of review. *INA Walzlager Schaeffler KG v. United*

---

**9.** Torrington originally claimed that a clerical error existed concerning SKF–Italy. Torrington withdrew this claim in its reply brief. *See Reply of The Torrington Company, Plaintiff, to Respons-* *es of the United States, Defendant, and Various Defendant–Intervenors to Torrington's Motion for Judgment on the Agency Record Pursuant to Rule 56.2* at 62.

*States,* 20 CIT ——, ——, 915 F.Supp. 420, 423 (1996). Accordingly, the Court agrees with Torrington and Commerce that a clerical error exists and should be corrected on remand.

After an examination of the administrative record, the Court finds that a remand is necessary for Commerce to correct all of the clerical errors alleged by Torrington. This case is hereby remanded to Commerce to correct the errors.

### Conclusion

In accordance with the foregoing opinion, this case is remanded to Commerce to: (1) reconsider its methodology for computing inventory carrying costs; (2) reallocate NSK's advertising expenses; (3) deny adjustment to FMV for home market pre-sale freight expenses where FMV was calculated using purchase price; (4) develop a methodology which removes post-sale price adjustments and rebates paid on sales of out-of-scope merchandise from its calculations of FMV or, if no viable method can be developed, deny such an adjustment in its calculation of FMV; (5) reconsider its decision to accept NTN's downward adjustments to United States indirect selling expenses for interest paid on cash deposits; (6) determine whether NTN demonstrated that selling expenses for aftermarket customers were different than for distributors and OEMs and, if not, collapse sales to aftermarket customers and distributors to form a single level of trade; (7) provide a reasonable explanation as to why Commerce changed its finding in the original investigation that "Route B" sales are third country sales or, if none can be given, exclude these sales from the home market database; (8) determine whether NMB/Pelmec's related party sales were made at market prices and, if not, exclude such sales from its calculation of profit; and (9) correct various clerical errors. Commerce is sustained as to all other issues.

Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days after the date responses or comments are due.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that this case is remanded to the Department of Commerce, International Trade Administration ("Commerce"), to: (1) reconsider its methodology for computing inventory carrying costs; (2) reallocate NSK's advertising expenses; (3) deny adjustment to FMV for home market pre-sale freight expenses where FMV was calculated using purchase price; (4) develop a methodology which removes post-sale price adjustments and rebates paid on sales of out-of-scope merchandise from its calculations of FMV or, if no viable method can be developed, deny such an adjustment in its calculation of FMV; (5) reconsider its decision to accept NTN's downward adjustments to United States indirect selling expenses for interest paid on cash deposits; (6) determine whether NTN demonstrated that selling expenses for aftermarket customers were different than for distributors and original equipment manufacturers and, if not, collapse sales to aftermarket customers and distributors to form a single level of trade; (7) provide a reasonable explanation as to why Commerce changed its finding in the original investigation that "Route B" sales are third country sales or, if none can be given, exclude these sales from the home market database; (8) determine whether NMB/Pelmec's related party sales were made at market prices and, if not, exclude such sales from its calculation of profit; and (9) correct various clerical errors; and it is further

**ORDERED** that the remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter; any rebuttal comments are due within fifteen (15) days of the date that responses or comments are due.